```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF KANSAS
 2
     UNITED STATES OF AMERICA,      Docket No.12-20003-CM
 3
        Plaintiff,                  Kansas City, Kansas
 4                                  Date:  9/26/12
         v.
 5
     STEVEN M HOHN &
 6   MICHAEL C REDIFER,

 7      Defendants.
     ....................
 8
                       TRANSCRIPT OF
 9                 MOTION TO SUPPRESS
           BEFORE THE HONORABLE CARLOS MURGUIA,
10             UNITED STATES DISTRICT JUDGE.

11   APPEARANCES:

12   For the Plaintiff:    Terra Morehead
                           Asst. US Attorney
13                         360 US Courthouse
                           500 State Avenue
14                         Kansas City, KS  66101

15   For Defendant Hohn:   James R Campbell
                           Attorney at Law
16                         511 Neosho Street
                           Burlington, KS  66839
17
     Court Reporter:       Nancy Moroney Wiss, CSR, RMR, FCRR
18                         Official Court Reporter
                           558 US Courthouse
19                         500 State Avenue
                           Kansas City, KS  66101
20
     Proceedings recorded by machine shorthand, transcript
21   produced by computer-aided transcription.

22

23

24

25
```

1                      I N D E X

2    GOVERNMENT'S WITNESS:

3       Perry Williams
            Direct Exam by Ms. Morehead            4
4           Cross Exam by Mr. Campbell            42
            Re-Direct Exam by Ms. Morehead       52
5

6    Argument by Ms. Morehead                     56
     Argument by Mr. Campbell                     62
7       Court's Ruling                           65

8

9    EXHIBITS:              OFFERED          RECEIVED
     Govt's 1-2               32                32
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

14:35:43  1          THE COURT:  Court calls Case Number

14:35:49  2  12-20003-03.  It's a case entitled United States of

14:35:52  3  America versus Steven Hohn.  Parties please enter their

14:35:56  4  appearance.

14:35:57  5          MS. MOREHEAD:  May it please the court,

14:35:58  6  Terra Morehead, Assistant United States Attorney,

14:35:59  7  appearing on behalf of the government.

14:36:01  8          MR. CAMPBELL:  May it please the court, Your

14:36:04  9  Honor, defendant appears in person, by and through James

14:36:06  10  Campbell.

14:36:07  11          THE COURT:  Is that pronounced right,

14:36:10  12  Mr. Hohn?

14:36:11  13          MR. CAMPBELL:  Hohn.

14:36:12  14          THE COURT:  Hohn.  Mr. Hohn, we're here

14:36:14  15  because Mr. Campbell has filed a motion to suppress

14:36:17  16  evidence from global positioning system device on your

14:36:21  17  behalf, and that's Document 153.  I would let you know

14:36:26  18  that I all ready had an opportunity to review the

14:36:30  19  motion, any documents that have been filed regarding

14:36:32  20  this motion, and the court's ready to proceed with this

14:36:35  21  hearing.  If the parties are ready to proceed, please do

14:36:38  22  so.

14:36:38  23          MS. MOREHEAD:  Judge, I would call Perry

14:36:41  24  Williams to the stand.

14:36:47  25          THE COURT:  Come right up here.  Before you

| | | |
|---|---|---|
| 14:36:49 | 1 | take your seat, please raise your right hand. |
| 14:36:52 | 2 | (Witness sworn.) |
| 14:36:57 | 3 | THE WITNESS: Yes, I do. |
| 14:36:58 | 4 | THE COURT: Thank you. Please take your |
| 14:37:00 | 5 | seat. Careful as you get in there. If you would, as |
| 14:37:05 | 6 | you give your answers to the questions you're asked, |
| 14:37:07 | 7 | please speak up loud and clear and speak into the |
| 14:37:09 | 8 | microphone. |
| 14:37:10 | 9 | THE WITNESS: Yes, sir. |
| 14:37:10 | 10 | THE COURT: Have you start with you stating |
| 14:37:12 | 11 | your name. |
| 14:37:12 | 12 | THE WITNESS: My name is Perry Williams. |
| 14:37:15 | 13 | THE COURT: Please spell your name. |
| 14:37:16 | 14 | THE WITNESS: First name P E R R Y. Last |
| 14:37:19 | 15 | name is Williams, W I L L I A M S. |
| 14:37:23 | 16 | THE COURT: Thank you. Miss Morehead. |
| 14:37:23 | 17 | PERRY WILLIAMS, |
| 14:37:23 | 18 | Called as a witness on behalf of the government, having |
| 14:37:23 | 19 | been first duly sworn, testified as follows: |
| 14:37:25 | 20 | DIRECT EXAMINATION |
| 14:37:25 | 21 | BY MS. MOREHEAD: |
| 14:37:27 | 22 | Q. Please tell the court where you're employed. |
| 14:37:28 | 23 | A. I'm currently employed with the Johnson County |
| 14:37:31 | 24 | sheriff's office in Johnson County, Kansas as a deputy |
| 14:37:34 | 25 | sheriff. |

NANCY MORONEY WISS, CSR, RMR, FCRR

14:37:35   1     Q.   And relative to your -- and how long have you

14:37:38   2   been a law enforcement officer?

14:37:39   3     A.   Approximately 23 years.

14:37:42   4     Q.   And relative to your career in law enforcement,

14:37:46   5   can you relate to us your history as it relates to

14:37:50   6   specifically matters that are connected to drug

14:37:55   7   trafficking investigations?

14:37:56   8     A.   Since 2002, I've been assigned to -- I was

14:38:00   9   assigned to street drug unit, at that time, continued my

14:38:05   10  drug investigations up 'til 2007 when I was assigned to

14:38:10   11  the drug -- Drug Enforcement Administration task force

14:38:13   12  as a task force officer from January 2007 until January

14:38:17   13  of 2010.  And I was transferred back to the Johnson

14:38:21   14  County sheriff's office in the drug unit to continue

14:38:24   15  working in and investigating drug cases.

14:38:27   16    Q.   And in connection with specifically the

14:38:31   17  investigation of drug cases, have you received training

14:38:36   18  as it relates to those sorts of investigations?

14:38:39   19    A.   Yes, I've received approximately 200 hours of

14:38:43   20  training in investigating drug crimes.

14:38:45   21    Q.   And in connection with your investigations, have

14:38:50   22  they -- do you have any sort of numbers of

14:38:56   23  investigations that you've actually been involved in?

14:38:58   24    A.   I've been involved in approximately 400

14:39:00   25  undercover buys, either in a support role or as an

14:39:03  1  undercover officer.  I've had approximately probably

14:39:09  2  200 cases of my own, to include other federal cases that

14:39:13  3  are complex conspiracies that involve wire taps, money

14:39:19  4  laundering, and transportation, distribution of

14:39:22  5  marijuana, cocaine, and methamphetamine.

14:39:25  6      Q.  And related to your employment as a law

14:39:28  7  enforcement officer, have your duties and

14:39:31  8  responsibilities included on occasion applying for and

14:39:36  9  receiving authorization to obtain search warrants for

14:39:41  10  different facets of your investigation?

14:39:44  11      A.  Yes, I've applied for and received approximately

14:39:48  12  between 250 and 300 search warrants or warrants of some

14:39:53  13  type.

14:39:54  14      Q.  Okay.  In connection with the case you're here to

14:39:57  15  testify about involving Steven Hohn, were you one of the

14:40:01  16  primary investigators who investigated he and others

14:40:05  17  that are currently indicted in Case Number 12-20003?

14:40:11  18      A.  Yes, I was.

14:40:12  19      Q.  And related to that investigation, tell us

14:40:19  20  approximately when law enforcement's investigation of

14:40:22  21  these individuals began or -- or when information was

14:40:27  22  received related to that investigation.

14:40:30  23      A.  The investigation originally began, I believe, in

14:40:34  24  February of 2010 is when we started receiving

14:40:38  25  information of an individual that was reported to be

14:40:41  1   distributing large quantities of methamphetamine in the

14:40:45  2   Gardner, Kansas area.  Upon further investigation, it

14:40:48  3   was found that Steven Hohn was a target of that

14:40:53  4   investigation who resided at 126 Manor Place.  That case

14:40:58  5   was assigned to a different officer at the time.  Later,

14:41:01  6   that officer got -- was promoted, and the case was

14:41:06  7   transferred to another officer within the unit, and that

14:41:09  8   was approximately January of 2011 is when the case

14:41:15  9   became an investigation started back up again on the

14:41:19 10   case.  I was still working on another case on the

14:41:25 11   federal level, and upon returning to the drug unit in

14:41:29 12   March of 2011, the case was still moving slow, gaining

14:41:35 13   information and interviewing more people to find

14:41:39 14   additional information.  Then in July of 2011, that's

14:41:45 15   when the case became a little more active, quite a bit

14:41:49 16   more active, and at that time is when we started

14:41:54 17   applying GPS trackers to vehicles.

14:41:56 18       Q.   And related to this investigation, Deputy

14:42:01 19   Williams, was one of the individuals identified in -- at

14:42:05 20   some point, the defendant Steven Hohn?

14:42:08 21       A.   Yes.

14:42:08 22       Q.   And can you relate to the judge kind of how he

14:42:13 23   came to be known as a participant in this drug

14:42:20 24   conspiracy that you and other law enforcement officers

14:42:23 25   investigated?

14:42:23  1       A.   We were receiving information from the Gardner

14:42:26  2   Police Department, and Mr. Hohn's name was mentioned in

14:42:30  3   most of those reports.  We were also attempting to do

14:42:35  4   surveillance on Mr. Hohn, which was a difficult task to

14:42:40  5   accomplish because he lives on a cul de sac, and one way

14:42:44  6   in, one way out, and it's a very short cul de sac.

14:42:49  7   During the investigation, more confidential informants

14:42:54  8   and confidential sources of information continued to

14:42:57  9   contact Deputy Denton who would interview them and

14:43:01 10   obtain additional information throughout the

14:43:04 11   investigation of all -- I shouldn't say all, but most of

14:43:09 12   them implicating Mr. Hohn as being involved in the

14:43:14 13   distribution of methamphetamine.

14:43:15 14       Q.   And related to the identification of Mr. Hohn,

14:43:20 15   obviously, you've mentioned that you identified a

14:43:23 16   location where he lived on a cul de sac.  And what was

14:43:27 17   that address?

14:43:27 18       A.   That address was 126 Manor Place, Gardner,

14:43:32 19   Kansas.

14:43:32 20       Q.   And in connection with Mr. Hohn, were there any

14:43:38 21   specific vehicles that were associated with him that you

14:43:43 22   or other law enforcement were able to identify in those

14:43:46 23   initial stages of the investigation?

14:43:48 24       A.   Yes, two vehicles were identified as being

14:43:51 25   associated with Mr. Hohn, one being a black 1997 Ford

| | | |
|---|---|---|
| 14:43:57 | 1 | F-150 truck, extended cab.  The other was a silver Ford |
| 14:44:02 | 2 | Explorer. |
| 14:44:02 | 3 | Q.  And in connection with -- one second, Judge.  One |
| 14:44:32 | 4 | second, Judge. |
| 14:44:32 | 5 | THE COURT:  Uh-huh. |
| 14:44:52 | 6 | BY MS. MOREHEAD: |
| 14:44:53 | 7 | Q.  And related to the black 1997 Ford F-150 truck, |
| 14:45:04 | 8 | were observations, physical observations made related to |
| 14:45:07 | 9 | Mr. Hohn's use of that particular vehicle? |
| 14:45:10 | 10 | A.  Yes, through physical surveillance and visual |
| 14:45:15 | 11 | surveillance, and also pole camera was set up in the |
| 14:45:18 | 12 | area, we were able to identify that Mr. Hohn most |
| 14:45:22 | 13 | frequently drove the black 1997 Ford F-150 truck. |
| 14:45:27 | 14 | Q.  And you mentioned that there were some other |
| 14:45:36 | 15 | tools that you were using during the course of this |
| 14:45:38 | 16 | investigation, one being that I just heard you mention |
| 14:45:40 | 17 | was in reference to a pole camera.  And were pole |
| 14:45:44 | 18 | cameras utilized during your investigation? |
| 14:45:45 | 19 | A.  Yes, they were. |
| 14:45:46 | 20 | Q.  And how many different pole cameras were utilized |
| 14:45:51 | 21 | in this investigation? |
| 14:45:53 | 22 | A.  We had two pole cameras involved in the |
| 14:45:55 | 23 | investigation. |
| 14:45:56 | 24 | Q.  And what location specifically were they focused |
| 14:46:01 | 25 | on? |

14:46:01  1    A.  The one was, excuse me, at 126 Manor Place,

14:46:07  2  Gardner, Kansas.  The other one was at 8200 Kaw Avenue

14:46:09  3  in Desoto, Kansas.

14:46:11  4    Q.  And the 126 Manor Place being Mr. Hohn's

14:46:15  5  residence, correct?

14:46:16  6    A.  Correct.

14:46:16  7    Q.  And the other address, 8200 Kaw Avenue in Desoto,

14:46:21  8  who was that address associated with?

14:46:23  9    A.  That address is associated with a Robert Baitey.

14:46:26  10    Q.  And he's a co-defendant in this case?

14:46:28  11    A.  Yes, ma'am.

14:46:29  12    Q.  And in connection with those two cameras,

14:46:33  13  specifically, were -- was there any information that

14:46:37  14  you -- and you -- first of all, maybe -- let me back up.

14:46:41  15  Do you remember when those pole cameras were utilized at

14:46:44  16  those two addresses, Deputy Williams?

14:46:47  17    A.  I don't have the exact dates, but I believe it

14:46:50  18  was in August of 2011 up until December of 2011.

14:46:59  19    Q.  And as it relates to those two addresses, was

14:47:03  20  there any information obtained by way of the video

14:47:08  21  footage from those cameras that officers obtained

14:47:15  22  relative to Steven Hohn and activities related to the

14:47:19  23  1997 Ford F-150 truck?

14:47:22  24    A.  Yes, we were able to determine when Mr. Hohn

14:47:26  25  would leave his residence at 126 Manor Place, when he

| 14:47:30 | 1 | was down there, and also, we observed that truck arrive |
| 14:47:34 | 2 | at the 8200 Kaw Avenue address on numerous occasions. |
| 14:47:40 | 3 | Q.   And so, in connec-- and that pole camera |
| 14:47:46 | 4 | monitoring, was that continuous once it was installed in |
| 14:47:51 | 5 | approximately August of 2011? |
| 14:47:53 | 6 | A.   Yes, it was continuous and recorded. |
| 14:47:56 | 7 | Q.   And so, with regards to the 126 Manor Place, you |
| 14:48:02 | 8 | had the ability at any given time from between August |
| 14:48:06 | 9 | and December to observe Steven Hohn in this 1997 Ford |
| 14:48:14 | 10 | F-150 truck either leaving or arriving at that address? |
| 14:48:19 | 11 | A.   Yes. |
| 14:48:19 | 12 | Q.   Correct? |
| 14:48:20 | 13 | A.   Yes, ma'am. |
| 14:48:21 | 14 | Q.   And with regards to the 8200 Kaw Avenue, same |
| 14:48:26 | 15 | thing, if Mr. Hohn and/or this black 1997 Ford F-150 |
| 14:48:33 | 16 | truck arrived at that location, the pole camera between |
| 14:48:38 | 17 | August and December would have captured that activity as |
| 14:48:44 | 18 | well? |
| 14:48:44 | 19 | A.   Yes, ma'am. |
| 14:48:44 | 20 | Q.   In addition, I think I heard you say that there |
| 14:48:50 | 21 | were -- there was surveillance that was occurring by law |
| 14:48:56 | 22 | enforcement personnel dating back to early in this |
| 14:49:01 | 23 | investigation? |
| 14:49:02 | 24 | A.   Yes, there was a surveillance conducted back in |
| 14:49:09 | 25 | 2010, and then it started -- surveillance started again |

| | |
|---|---|
| 14:49:12 | 1 |
| 14:49:17 | 2 |
| 14:49:18 | 3 |
| 14:49:22 | 4 |
| 14:49:25 | 5 |
| 14:49:28 | 6 |
| 14:49:32 | 7 |
| 14:49:36 | 8 |
| 14:49:37 | 9 |
| 14:49:41 | 10 |
| 14:49:45 | 11 |
| 14:49:50 | 12 |
| 14:49:55 | 13 |
| 14:49:56 | 14 |
| 14:49:57 | 15 |
| 14:49:59 | 16 |
| 14:50:00 | 17 |
| 14:50:05 | 18 |
| 14:50:08 | 19 |
| 14:50:15 | 20 |
| 14:50:18 | 21 |
| 14:50:23 | 22 |
| 14:50:28 | 23 |
| 14:50:33 | 24 |
| 14:50:36 | 25 |

in early in 2011.  I was not involved in any of those surveillances at that time.

Q.   And did the surveillance activity continue even after you became involved in the investigation, which I think you said was approximately July of 2011?

A.   Yes, I -- I became actively involved in the case, in actually August of 2011 is when I became actively involved in it.

Q.   And -- and between -- let's say between July 2011 up until December of 2011, were there numerous occasions where you and/or other law enforcement personnel would have conducted visual surveillance of the defendants that have been charged in this case?

A.   Yes.

Q.   And does that include Steven Hohn?

A.   Yes, it does.

Q.   And in connection with the visual surveillance, what did that consist of as it related to Steven Hohn?

A.   What we found was, is that Mr. Hohn was I believe having some family problems, and he was living at another address, 1326 South Main Street in Eudora, Kansas, and he would frequent the 126 Manor Place address, and during our surveillance of Mr. Hohn, there were blacktop roads that could be traveled all the way up to the Eudora address.  What we found was, is

| | |
|---|---|
| 14:50:40 | 1 |
| 14:50:45 | 2 |
| 14:50:49 | 3 |
| 14:50:53 | 4 |
| 14:50:57 | 5 |
| 14:51:00 | 6 |
| 14:51:03 | 7 |
| 14:51:07 | 8 |
| 14:51:10 | 9 |
| 14:51:19 | 10 |
| 14:51:25 | 11 |
| 14:51:27 | 12 |
| 14:51:30 | 13 |
| 14:51:36 | 14 |
| 14:51:43 | 15 |
| 14:51:47 | 16 |
| 14:51:52 | 17 |
| 14:51:59 | 18 |
| 14:52:03 | 19 |
| 14:52:08 | 20 |
| 14:52:12 | 21 |
| 14:52:15 | 22 |
| 14:52:18 | 23 |
| 14:52:19 | 24 |
| 14:52:24 | 25 |

1  Mr. Hohn would spend a lot of time on gravel roads

2  driving slow.  It would be late night travel which made

3  it virtually impossible to maintain a visual

4  surveillance on him.  Most of the time, we would have to

5  break off the surveillance and try to figure out where

6  he was going, and try to get ahead of him and see if we

7  could catch up to him at that new location.

8      Q.   And in connection with all of the visual

9  surveillance that you did of Mr. Hohn, were -- did that

10  activity occur on public roadways viewable by anyone

11  that would be traveling on those roadways?

12      A.   Yes, ma'am.

13      Q.   And in connection with the surveillance of

14  Mr. Hohn, what specific locations did visual

15  surveillance -- I know you mentioned that you had him

16  connected to his home address which was 126 Manor Place

17  in Gardner, that you identified the 1326 Main in Eudora.

18  Obviously, we know he frequented 8200 Kaw Avenue in

19  Desoto because of the pole camera.  Did -- did visual

20  surveillance follow him to that address as well?

21      A.   Yes, eventually, we -- we started doing visual

22  surveillance, and actually followed him to that address

23  on a visual surveillance.

24      Q.   And were there any other locations important to

25  this investigation where visual surveillance was

14:52:29    1    conducted where you observed Mr. Hohn go to different

14:52:39    2    locations?

14:52:39    3        A.   The other -- one of the other addresses that he

14:52:42    4    went to, we physically saw was at 809 Cedar in Gardner,

14:52:48    5    Kansas, which was the subject of two separate search

14:52:51    6    warrants at that location involved in this

14:52:53    7    investigation.

14:52:54    8        Q.   Okay.  And that was -- you made those

14:52:57    9    observations related to 809 Cedar.  Did you say that was

14:53:03   10    in Gardner?

14:53:03   11        A.   Yes, ma'am.

14:53:04   12        Q.   You made those observations in connection with

14:53:09   13    your visual surveillance then?

14:53:11   14        A.   There was tracker information and visual

14:53:12   15    information, and we also had reports of Mr. Hohn going

14:53:16   16    to that address prior to the GPS tracker.

14:53:20   17        Q.   All right.  And I don't want to mention -- I'm --

14:53:23   18    I didn't want to mention the tracker yet.

14:53:25   19        A.   Okay.

14:53:25   20        Q.   But related to visual surveillance, you had

14:53:28   21    observed him go to that address on occasion during this

14:53:32   22    investigation?

14:53:33   23        A.   Yes, ma'am.

14:53:33   24        Q.   And in connection with other aspects of this

14:53:58   25    investigation, I think I also heard you say that you had

14:54:05  1   information from independent sources by way of either

14:54:09  2   corroborating individuals or cooperating sources.  Is

14:54:15  3   that right?

14:54:15  4        A.   Yes.

14:54:16  5        Q.   And the items that -- because another thing that

14:54:23  6   you just mentioned, which is obviously the topic of this

14:54:26  7   hearing, is the GPS monitoring that occurred with

14:54:31  8   regards to a GPS tracker that was placed on that 1997

14:54:35  9   Ford F-150 truck, is that right?

14:54:37 10        A.   Yes, ma'am.

14:54:37 11        Q.   And so, independent of that tracker, you had

14:54:43 12   other sources of information that you were able to

14:54:48 13   obtain information on related to Mr. Hohn's criminal

14:54:55 14   activities as it has been charged in this indictment, is

14:54:59 15   that right?

14:54:59 16        A.   Correct.

14:54:59 17        Q.   Was there anything at all -- well, let's talk

14:55:03 18   about the -- the GPS tracker.  In connection with the

14:55:09 19   tracker, did I ask you to go through the investigative

14:55:16 20   file and give a time line of when the tracker was

14:55:22 21   actually utilized in connection with the 1997 Ford F-150

14:55:27 22   truck belonging to Steven Hohn?

14:55:29 23        A.   Yes, ma'am.

14:55:29 24        Q.   And because there were other trackers that you

14:55:33 25   placed on other individuals' vehicles in this

14:55:36    1    investigation, is that right?

14:55:37    2        A.   Correct.

14:55:37    3        Q.   And what other vehicles did you place trackers

14:55:41    4    on?

14:55:42    5        A.   It was a 2000 Ford F-150 that was driven by Bob

14:55:48    6    Baitey.  I believe it's a 2006 Ford Explorer that was

14:55:52    7    driven by Amanda Hohn and Steven Hohn, and then I

14:55:56    8    believe it's a 2006 Ford F-150 truck that was driven by

14:56:03    9    Casey cross.

14:56:04   10        Q.   All right.  And -- but as it relates specifically

14:56:07   11    to this motion, you're aware that there's been a motion

14:56:11   12    filed seeking suppression of any of the tracking

14:56:14   13    information related to Steven Hohn's vehicle?

14:56:18   14        A.   Correct.

14:56:19   15        Q.   And when did law enforcement first utilize a GPS

14:56:26   16    tracker on that particular vehicle as it relates to this

14:56:30   17    investigation?

14:56:31   18        A.   GPS tracker was placed on the black '97 Ford

14:56:36   19    F-150 on July 24th, 2011.

14:56:39   20        Q.   And what kind of a tracking device was that,

14:56:43   21    Deputy Williams?

14:56:43   22        A.   The brand name is called Orion.  It's an 820 GPS

14:56:49   23    tracker.

14:56:54   24        Q.   And what -- tell -- describe for us how that

14:56:57   25    tracker operates.

| | |
|---|---|
| 14:57:00 | 1 |
| 14:57:04 | 2 |
| 14:57:09 | 3 |
| 14:57:12 | 4 |
| 14:57:17 | 5 |
| 14:57:21 | 6 |
| 14:57:25 | 7 |
| 14:57:30 | 8 |
| 14:57:35 | 9 |
| 14:57:36 | 10 |
| 14:57:39 | 11 |
| 14:57:42 | 12 |
| 14:57:46 | 13 |
| 14:57:51 | 14 |
| 14:57:54 | 15 |
| 14:58:00 | 16 |
| 14:58:04 | 17 |
| 14:58:05 | 18 |
| 14:58:10 | 19 |
| 14:58:14 | 20 |
| 14:58:14 | 21 |
| 14:58:19 | 22 |
| 14:58:21 | 23 |
| 14:58:26 | 24 |
| 14:58:29 | 25 |

A.   It is a -- it has a SGPS receiver in it, it has a cell phone receiver in it, antenna, and it is battery operated.  So, whenever you put it together, you can basically place it almost anywhere on the vehicle and get a signal, and that was the reason for utilizing that particular tracker for the battery power.

Q.   And in connection with that GPS signal then, how is it presented to law enforcement?  In other words, how do you monitor it?

A.   The way we monitor it, we can set up boundaries to let us know when they leave an area, when they come into an area.  We can set up for a start motion, a stop motion.  If we just want to track it live, we take a laptop computer with an air card.  We actually connect to the tracker itself, and we're able to watch on a map just a dot go along on the roadways or where that vehicle's going.

Q.   Okay.  And so, on July 24th, 2011, this tracking device was placed on the 1997 Ford F-150?

A.   Yes, it was.

Q.   And in connection with that event, when -- when did that happen?

A.   It happened at approximately 4 AM in the morning.

Q.   And in connec-- and where did that happen at?

A.   That happened at 1326 South Main in Eudora,

| | |
|---|---|
| 14:58:34 | 1 |
| 14:58:34 | 2 |
| 14:58:38 | 3 |
| 14:58:42 | 4 |
| 14:58:43 | 5 |
| 14:58:44 | 6 |
| 14:58:50 | 7 |
| 14:58:53 | 8 |
| 14:58:54 | 9 |
| 14:58:59 | 10 |
| 14:59:03 | 11 |
| 14:59:07 | 12 |
| 14:59:08 | 13 |
| 14:59:11 | 14 |
| 14:59:14 | 15 |
| 14:59:18 | 16 |
| 14:59:19 | 17 |
| 14:59:19 | 18 |
| 14:59:25 | 19 |
| 14:59:27 | 20 |
| 14:59:28 | 21 |
| 14:59:32 | 22 |
| 14:59:34 | 23 |
| 14:59:39 | 24 |
| 14:59:43 | 25 |

Kansas.

Q.   And that was the alternate address that you said you came to realize Mr. Hohn was at least at some point residing at?

A.   Yes.

Q.   And was that a vehicle parked in a public area?

A.   It was parked in the open driveway area of the residence.

Q.   And in connection with affixing that tracker on the vehicle, you said it could just be slapped on anywhere on the vehicle; how -- how is it affixed then on the vehicle?

A.   It uses a series of magnets.  As long as you can find metal, you can get it put on the vehicle.

Q.   And is that the manner which it was first attached to the vehicle?

A.   Yes.

Q.   And the battery pack, it was self-contained where it was drawing on its own power, is that right?

A.   Correct.

Q.   And before this date, and I know you weren't -- you didn't become involved in the investigation until several weeks later, but at least as of July 24th when this device was used, had you used devices like that on many, many prior occasions in your various

14:59:47   1   investigations that you had been involved in?

14:59:49   2       A.   Yes, I have.

14:59:50   3       Q.   And the -- the device itself you indicated was

14:59:58   4   battery operated.  Are there some limitations as a

15:00:02   5   result of that, that this type of device has?

15:00:05   6       A.   Yes, the -- what you end up doing is in -- you

15:00:10   7   limit your live tracking, because whenever you're

15:00:12   8   connected to it, it uses more power which takes away

15:00:15   9   from the life of the GPS tracker without replacing the

15:00:19   10  batteries.

15:00:20   11      Q.   And when this tracker was placed on the vehicle

15:00:25   12  on July 24th, what type of monitoring occurred in

15:00:29   13  connection with the vehicle initially?

15:00:34   14      A.   There was limited tracking, live tracking on the

15:00:38   15  vehicle at that time.  It was just -- what you usually

15:00:41   16  try to do is just try to get a base line of what their

15:00:43   17  activity is, just let the GPS tracker do its work,

15:00:47   18  collect data, and then you go back and see, so you can

15:00:50   19  kind of see if there's a pattern to their travels and to

15:00:53   20  their -- their habits and what their activity is.

15:00:56   21      Q.   Okay.  Aside from the tracker, though, you were

15:01:00   22  acquiring information, similar information from other

15:01:03   23  sources, is that right?

15:01:05   24      A.   Correct, there are still people cooperating and

15:01:08   25  giving additional information.

15:01:10   1       Q.   And there's the visual surveillance and there's

15:01:12   2   pole camera surveillance?

15:01:13   3       A.   Correct.

15:01:14   4       Q.   And so, this initial installation of the tracker,

15:01:18   5   how long did that last?

15:01:19   6       A.   That lasted until I believe approximately

15:01:26   7   August 1st is when the tracker -- the power failed on

15:01:29   8   it.

15:01:29   9       Q.   Okay.  So, for about a week, it was up and

15:01:33  10   running.  August 1st, the battery pack fails.  And so,

15:01:37  11   what -- the tracker obviously is still on the vehicle.

15:01:42  12   Is it -- is there any information that we're getting

15:01:45  13   after the battery fails?

15:01:47  14       A.   No.

15:01:48  15       Q.   And so, what happens after August 1st?

15:01:51  16       A.   It took a couple days before they could locate

15:01:55  17   the vehicle.  The vehicle was located once again at 1326

15:02:00  18   Main Street, Eudora, Kansas.  They were able to retrieve

15:02:06  19   the tracker from the vehicle, they replaced the

15:02:08  20   batteries, and due to activity at the residence, another

15:02:14  21   individual that lived there Mike, Michael Quick, was

15:02:17  22   observed leaving the residence, and then he came back,

15:02:20  23   that it was decided at that point not to -- to -- to

15:02:23  24   apply the tracker back, to attempt that due to the foot

15:02:27  25   traffic.

15:02:27   1      Q.   So, August 1st, the tracker was not put back on,

15:02:31   2  or after August 1st, because the battery failed, when

15:02:33   3  was the next time the tracker was utilized relative to

15:02:36   4  that vehicle?

15:02:38   5      A.   It would have been August 17th, 2011.

15:02:41   6      Q.   And tell us about that occasion when the tracker

15:02:44   7  was used on the vehicle.

15:02:46   8      A.   We had been conducting surveillance down in

15:02:49   9  Gardner in reference to the 126 Manor Place location.

15:02:55   10  We had not seen Mr. Hohn down there.  Part of the

15:02:58   11  surveillance broke off and drove up to Eudora.  Located

15:03:01   12  the black F-150 parked in the driveway again, responded

15:03:05   13  up to that location, and at approximately 1 AM, I was

15:03:09   14  able to get up to the vehicle and place the tracker on

15:03:11   15  it.

15:03:11   16      Q.   And so, that was on August 17th?

15:03:14   17      A.   Yes, ma'am.

15:03:14   18      Q.   And what type of monitoring of the tracker

15:03:18   19  occurred after the tracker was placed on it on

15:03:22   20  August 17th?

15:03:23   21      A.   Once again, it was periodic live tracking on the

15:03:26   22  vehicle.  And when I refer to live tracking, that means

15:03:30   23  we were -- actually had it up and viewing it on the

15:03:33   24  computer, but the GPS tracker itself was collecting data

15:03:38   25  24 hours a day at that point.

15:03:39   1    Q.   Okay.  And so, how long did the tracker remain

15:03:45   2   functional after August 17th?

15:03:48   3    A.   We were conducting visual surveillance on the

15:03:51   4   vehicle on August 24th at approximately -- I believe it

15:03:55   5   was around 1600 hours or 4 PM, and we saw Mr. Hohn come

15:04:01   6   out of the trailer, get in the vehicle with another

15:04:04   7   female, and leave the area, and the batteries once again

15:04:09   8   failed on the vehicle.

15:04:10   9    Q.   All right.  When was the next time you were able

15:04:14   10  to make the GPS functional then regarding this vehicle?

15:04:23   11   A.   It was on August 26th, at approximately 1 AM, I

15:04:27   12  was able to get up to the vehicle, remove the tracker,

15:04:30   13  replace the batteries, and put it back on the vehicle.

15:04:33   14   Q.   All right.  And was -- was that again at the

15:04:37   15  address of 1326 Main in Eudora?

15:04:40   16   A.   Yes, ma'am.

15:04:40   17   Q.   And from August 26th moving forward, what steps

15:04:46   18  did you take in order to make the tracker functional?

15:04:51   19   A.   On August 28th, we -- we got a -- there's an

15:04:54   20  alert when the batteries go low for some reason.  We got

15:04:57   21  that alert.  We were actually working a DUI check lane,

15:05:03   22  and Mr. Hohn drove through the check lane while we were

15:05:07   23  working, and later, we found that that vehicle was down

15:05:09   24  at the Candlewood Hotel, Candlewood Suites Hotel in

15:05:15   25  Olathe.  Deputy Denton and I went to that location,

15:05:19    1    located the vehicle, and once again, I removed the

15:05:21    2    tracker, replaced the batteries and placed the tracker

15:05:24    3    back on.

15:05:26    4        Q.   And when was the next time you had to do anything

15:05:28    5    related to the tracker?

15:05:29    6        A.   Would have been on September 13th, 2011.

15:05:33    7        Q.   And what happened on that date?

15:05:35    8        A.   We were able to -- we viewed him leaving his

15:05:42    9    residence that night on the pole camera, and then we

15:05:46   10    started tracking the vehicle.  We knew the batteries

15:05:49   11    were getting low.  We found the vehicle over at Wal-Mart

15:05:51   12    parking lot over off of east Santa Fe in Gardner,

15:05:56   13    Kansas.  While he was inside shopping, I was able to get

15:05:59   14    up to the vehicle, remove the tracker, and I believe I

15:06:02   15    replaced it with a different tracker on this occasion.

15:06:04   16        Q.   Okay.  That was on September 13th?

15:06:07   17        A.   Yes, ma'am.

15:06:07   18        Q.   And when was the next occasion something happened

15:06:11   19    related to the tracker?

15:06:13   20        A.   It would have been on September 28th, 2011, we

15:06:18   21    responded to the area, we located the vehicle utilizing

15:06:22   22    the pole camera down at 126 Manor Place, and we were

15:06:26   23    able to get up to the vehicle, remove the tracker and

15:06:30   24    replace the batteries on it.

15:06:31   25        Q.   Okay.  And when was the next event connected to

15:06:36  1    the device?

15:06:37  2        A.   On October 15th, 2011, we were able to make it up

15:06:42  3    to the vehicle, and once again, it was parked at 126

15:06:45  4    Manor Place, and we were able to replace the batteries

15:06:47  5    at that location.

15:06:48  6        Q.   Okay.  And when was the -- and so, during this

15:06:52  7    time from August 26th moving forward, it sounds like

15:06:56  8    there were multiple occasions where you replaced the

15:07:00  9    batteries before they failed, is that right?

15:07:02  10       A.   Correct.

15:07:03  11       Q.   And when was the next time then that you would

15:07:07  12   have done that?

15:07:08  13       A.   I believe on November 7th, we were able to find

15:07:12  14   the vehicle at the parking lot of Home Depot in Olathe

15:07:17  15   off 154th Street.  Once again, while he was inside

15:07:21  16   shopping, I was able to retrieve the GPS tracker,

15:07:24  17   replace the batteries and place it back on the vehicle.

15:07:26  18       Q.   Okay.  And so, given the issues with regards to

15:07:34  19   the self-contained battery pack, did you make a decision

15:07:38  20   at that point about the -- and this was on Mr. Hohn's

15:07:43  21   vehicle.  Were you having similar problems with the

15:07:45  22   other trackers that you were utilizing on the other

15:07:48  23   vehicles?

15:07:48  24       A.   Yes, we were.

15:07:50  25       Q.   Including Mr. Baitey's vehicle?

15:07:52  1    A.   Yes, ma'am.

15:07:52  2    Q.   And as a result of that, what did you decide to

15:07:56  3  do?

15:07:56  4    A.   We decided that we would get court orders to go

15:08:00  5  ahead and hard wire the trackers on Mr. Hohn's vehicle

15:08:03  6  and Mr. Baitey's vehicle.

15:08:04  7    Q.   And what does that encompass, the hard wiring of

15:08:08  8  the GPS into the actual vehicle?

15:08:12  9    A.   You actually go up and you gain access to the

15:08:17  10  engine compartment of the vehicle, you place the tracker

15:08:20  11  on the vehicle, and you actually hook -- you run wires

15:08:24  12  from the tracker to a power source on the vehicle to

15:08:29  13  power the tracker.

15:08:30  14    Q.   And because you were going to take those steps or

15:08:36  15  potentially going to take those steps, what did you

15:08:39  16  decide to do in order to accomplish or effectuate the

15:08:44  17  ability to access the power source of the vehicle?

15:08:49  18    A.   We went ahead and wrote an affidavit, and had a

15:08:53  19  court order issued to be able to hard wire or take power

15:08:57  20  from the vehicle to -- to power up our GPS trackers.

15:09:01  21    Q.   And when did you do that, Deputy Williams?

15:09:03  22    A.   On August -- I'm sorry, on -- on November 10th,

15:09:07  23  we actually had that order signed by a district judge.

15:09:10  24    Q.   And that was a Johnson County District Court

15:09:13  25  Judge?

15:09:13    1    A.   Yes, ma'am.

15:09:14    2    Q.   And the -- the tracker that you were utilizing

15:09:20    3    obviously had a battery pack to it once you obtained

15:09:25    4    that court order, and what time period was that for?

15:09:28    5    A.   That was for 30 days.

15:09:29    6    Q.   And once you acquired that initial search warrant

15:09:34    7    to get authorization to get the GPS and hard wire it,

15:09:42    8    did you ever -- did the opportunity ever arise where you

15:09:46    9    were able to do that?

15:09:47   10    A.   No, we -- we were unable to catch the vehicle in

15:09:51   11    a -- in a location that we felt we could accomplish it

15:09:53   12    without being compromised.

15:09:55   13    Q.   And is that sometimes difficult to do, to

15:09:59   14    actually accomplish hard wiring the device into the

15:10:03   15    power source of the vehicle?

15:10:04   16    A.   Yes, because it takes numerous acts, and number

15:10:08   17    one, you have to be able to get into the vehicle if it's

15:10:11   18    locked, you don't have the hood release, so you have to

15:10:13   19    manipulate the hood release to get into the vehicle, and

15:10:16   20    then you have to have enough time to be able to run your

15:10:19   21    wires in a -- a way that they can't be noticed, and it's

15:10:24   22    time consuming, and that's something that we generally

15:10:27   23    will not do in a driveway of a residence, and we were

15:10:31   24    having -- we were unable to catch the vehicle at another

15:10:34   25    location that gave us enough time to be able to

15:10:36   1   accomplish that.

15:10:37   2      Q.   And -- and once you obtained this court order on

15:10:43   3   November 10th, what was the next activity that occurred

15:10:45   4   with the tracker?

15:10:48   5      A.   Would have been on November 23rd, we actually

15:10:52   6   changed the battery pack down at 809 South Cedar in

15:10:57   7   Gardner, Kansas while it was sitting in the driveway at

15:10:59   8   that location.

15:11:00   9      Q.   Okay.  And you said that initial court order was

15:11:04  10   for 30 days?

15:11:05  11      A.   Correct.

15:11:06  12      Q.   From November 10th to approximately December 9th,

15:11:10  13   then, is that right?

15:11:11  14      A.   Yes, ma'am.

15:11:12  15      Q.   And what did you do related to that time period

15:11:16  16   once you knew that initial court order was going to

15:11:19  17   expire?

15:11:20  18      A.   We added it to our affidavit, went back to the

15:11:24  19   judge, and had an extension signed for another 30 days

15:11:26  20   on December 8th, 2011.

15:11:28  21      Q.   Okay.  And was that authorized at that time for

15:11:31  22   an extension for the GPS tracker and to hard wire it if

15:11:36  23   the opportunity arose?

15:11:37  24      A.   Correct.

15:11:38  25      Q.   And how long did that search warrant for the

15:11:43   1   tracker, court authorized tracker, how long did that
15:11:47   2   continue?
15:11:47   3       A.  It was for 30 days also.
15:11:49   4       Q.  And did you continue monitoring it for that
15:11:51   5   entire time?
15:11:52   6       A.  No, we did not.
15:11:53   7       Q.  And when did that end?
15:11:55   8       A.  We executed a search warrant at 809 South Cedar
15:11:59   9   on December 23rd, 2011, and at that time, we removed the
15:12:04  10   GPS tracker from the vehicle.
15:12:05  11       Q.  All right.  And in connection with the
15:12:13  12   investigation, obviously, Steven Hohn was one of your
15:12:18  13   targets.  Were there many other targets that you were
15:12:21  14   focusing attention on during that same time period?
15:12:24  15       A.  Yes, we -- we ended up having multiple people
15:12:29  16   that we were trying to follow and keep surveillance on,
15:12:34  17   one who remained very active on a daily basis going to
15:12:39  18   Kansas City, Kansas and the Lawrence area, and so, there
15:12:44  19   was -- there were three or four or five different people
15:12:47  20   that we were trying to maintain surveillance on.
15:12:49  21       Q.  And in connection with the -- the 1997 Ford
15:12:55  22   F-150, once you attached this GPS tracker on it, when it
15:13:02  23   was operational, aside from the times when the battery
15:13:04  24   pack failed which by my calculation, that would have
15:13:09  25   been between August 1st and August 17th, August 24th and

15:13:14  1  August 26th, those were the dates that there was no

15:13:19  2  tracking of the vehicle going on, is that right?

15:13:21  3      A.   Correct.

15:13:21  4      Q.   Otherwise, the tracker was on the vehicle, and

15:13:27  5  while you certainly had the ability to do live tracking,

15:13:30  6  the device itself was doing what -- was actually

15:13:36  7  capturing GPS data on the vehicle wherever it went?

15:13:42  8      A.   Correct.

15:13:42  9      Q.   Is that right?  And with regards to the movement

15:13:46  10 of the vehicle that you now know occurred related to the

15:13:52  11 information that you obtained from the GPS tracker, did

15:13:56  12 that vehicle -- and I know we talked before about visual

15:13:59  13 surveillance, seeing it on public roadways, but with

15:14:02  14 regards to the GPS tracker, were there any occasions

15:14:07  15 when the vehicle went to any private locations that

15:14:10  16 would not have been visible to someone who was lawfully

15:14:15  17 in the location where they were?

15:14:18  18      A.   There -- there was only one occasion that would

15:14:21  19 have been on November 15th, the location that Mr. Hohn

15:14:25  20 went to, the vehicle was visually -- you could see it

15:14:30  21 most of the time, but eventually, it did go to an area

15:14:34  22 that was a little more obscure.  If you were in the

15:14:38  23 right place, you would have been able to see it.

15:14:39  24      Q.   All right.  Other than that one occasion, though,

15:14:42  25 the vehicle was always visible or viewable to any member

15:14:46    1    of the public who was either traveling on a roadway or

15:14:51    2    lawfully positioned where the vehicle was?

15:14:55    3        A.   That is correct.

15:14:56    4        Q.   All right.  So, you indicated that on

15:15:02    5    November 10th, you applied for a state search warrant

15:15:04    6    for the tracker?

15:15:05    7        A.   Correct.

15:15:06    8        Q.   And had you applied for similar warrants -- I

15:15:11    9    know you said you had applied for search warrants

15:15:13   10    before, but had you applied for tracker search warrants

15:15:17   11    on prior occasions, Deputy Williams?

15:15:19   12        A.   I had not personally applied for one, but I had

15:15:22   13    been involved in applying for one back in 2005 through

15:15:29   14    Johnson County, and also through the federal system to

15:15:33   15    get one to where we could hard wire it on to the vehicle

15:15:36   16    also.

15:15:36   17        Q.   And you are certainly -- as we sit here today in

15:15:42   18    September of 2012, you're well aware of the Jones case

15:15:47   19    that came out in January of 2012.  Are you're aware of

15:15:52   20    that?

15:15:52   21        A.   Yes.  Yes, ma'am.

15:15:53   22        Q.   And before that Jones case came out, was there

15:16:00   23    any indication that you had that would have indicated to

15:16:05   24    you -- aside from a situation where you were going to

15:16:08   25    enter the vehicle and go about the business of hard

15:16:11  1  wiring, was there anything that you acted on that you

15:16:18  2  believed you needed a warrant in order to attach the GPS

15:16:23  3  tracker to the vehicle by way of utilizing its own power

15:16:32  4  source?

15:16:32  5      A.   The information we had received is that it was

15:16:35  6  lawful for us to be able to do that.

15:16:37  7      Q.   All right.   So, on November 10th, you applied for

15:16:41  8  a state search warrant to attach the tracker to the

15:16:45  9  vehicle which would include the opportunity to hard wire

15:16:48  10  it, is that right?

15:16:49  11      A.   Correct.

15:16:50  12      Q.   And did you prepare an affidavit related to the

15:16:56  13  investigation and why you were wanting to take those

15:17:04  14  steps?

15:17:05  15      A.   Yes.

15:17:06  16      Q.   And on December 8th when you got an extension

15:17:12  17  order signed, did you likewise submit an affidavit, a

15:17:17  18  similar affidavit to the state judge?

15:17:21  19      A.   Yes.

15:17:22  20      Q.   I want to hand you two documents, Government's

15:17:25  21  Exhibit Number 1 and Government's Exhibit Number 2, and

15:17:29  22  ask you if you can identify those two documents?

15:17:35  23      A.   Exhibit 1 would be my original -- excuse me -- my

15:17:51  24  original affidavit seeking the search warrant to apply

15:17:56  25  the GPS tracker to the truck, and Exhibit Number 2 would

| | | |
|---|---|---|
| 15:18:00 | 1 | be my extension affidavit. |
| 15:18:03 | 2 | Q.  All right.  And do those -- are those the two |
| 15:18:08 | 3 | documents then that the state judge reviewed in |
| 15:18:10 | 4 | connection with signing the warrant authorizing the |
| 15:18:14 | 5 | tracker to be placed on the vehicle first on |
| 15:18:20 | 6 | November 10th and then the extension on December -- |
| 15:18:23 | 7 | December 8th? |
| 15:18:23 | 8 | A.  Yes, ma'am. |
| 15:18:25 | 9 | MS. MOREHEAD:  Judge, for the purposes of |
| 15:18:26 | 10 | this hearing, I'd ask for admission of Government's |
| 15:18:29 | 11 | Exhibits 1 and 2, and I can show you. |
| 15:18:53 | 12 | MR. CAMPBELL:  No objections.  I apologize. |
| 15:18:56 | 13 | No objections, Your Honor. |
| 15:18:58 | 14 | THE COURT:  At this time court admits |
| 15:18:59 | 15 | Government's Exhibit Numbers 1 and 2. |
| 15:19:01 | 16 | MS. MOREHEAD:  And Judge, just for the |
| 15:19:02 | 17 | record, I know Mr. Campbell in his original motion |
| 15:19:09 | 18 | attached -- didn't you attach those to there? |
| 15:19:13 | 19 | MR. CAMPBELL:  I did not.  I referenced the |
| 15:19:15 | 20 | bates number pages. |
| 15:19:17 | 21 | MS. MOREHEAD:  Okay.  And he referenced the |
| 15:19:19 | 22 | affidavits, I think.  He, though, with regards to one of |
| 15:19:25 | 23 | those had the wrong -- as Deputy Williams indicated, |
| 15:19:29 | 24 | there were multiple search warrants that were obtained, |
| 15:19:33 | 25 | so these are the ones that related to Mr. Hohn's |

15:19:35  1   vehicle.  The information was the same.  It's just a

15:19:40  2   different vehicle, so -- and I think Mr. Campbell would

15:19:45  3   agree with that.

15:19:46  4               MR. CAMPBELL:  I do, Your Honor, that is

15:19:47  5   accurate.  Identical affidavits were filed by Deputy

15:19:53  6   Perry for all of the vehicles he referenced.  Each of

15:19:57  7   those affidavits was identical except for the portions

15:20:01  8   containing the description of the vehicle.  I've had an

15:20:02  9   opportunity to go over those in detail, and we have no

15:20:05 10   objection, and those documents you have before you are

15:20:08 11   going to be identical to anything we reference.

15:20:11 12               THE COURT:  Please continue.

15:20:13 13   BY MS. MOREHEAD:

15:20:14 14      Q.  With regards to those affidavits, Deputy

15:20:17 15   Williams, did -- did you try to be as complete and

15:20:21 16   accurate in the recitation of the facts that you were

15:20:26 17   relying upon asking the judge for authorization to -- to

15:20:32 18   authorize the GPS onto the 1997 Ford F-150 pick-up truck

15:20:41 19   belonging to Steven Hohn?

15:20:42 20      A.  Yes, I did.

15:20:43 21      Q.  And there were facts in there, too, specifically

15:20:47 22   as it relates to other people involved in this

15:20:50 23   conspiracy, including Robert Baitey, is that right?

15:20:54 24      A.  Yes, ma'am.

15:20:55 25      Q.  And any information -- obviously, November 10th,

15:21:04   1    the day you applied for this search warrant, there had

15:21:12   2    been three time periods within which tracking

15:21:16   3    information had been acquired, and again, that would

15:21:19   4    have been July 24th to August 1st, August 17th to

15:21:23   5    August 24th, and then August 26th leading up to

15:21:28   6    August -- or November 10th, correct?

15:21:30   7         A.   Correct.

15:21:30   8         Q.   And in connection with any relevant information

15:21:35   9    that you thought you had as it related to that GPS

15:21:39   10   information, did you specifically mention that or

15:21:44   11   reference that in this af-- in the -- in this affidavit?

15:21:48   12        A.   Yes, I believe I did.

15:21:49   13        Q.   And then when you applied for the extension on

15:21:55   14   December the 8th, did you include any additional tracker

15:22:03   15   information that had been acquired from November 10th

15:22:07   16   leading up to December 8th?

15:22:10   17        A.   Yes.

15:22:10   18        Q.   And -- and that would have been obviously under a

15:22:15   19   court order, court authorization, correct?

15:22:17   20        A.   Correct.

15:22:18   21        Q.   In that initial affidavit that you submitted to

15:22:25   22   Judge Welch on November 10th, aside from the tracker

15:22:32   23   information, was there other information that you

15:22:37   24   included about the 1997 Ford F-150 pick-up truck

15:22:44   25   belonging to Steven Hohn?

15:22:45  1       A.   Yes.

15:22:46  2       Q.   And did that include occasions when you and/or

15:22:51  3   other law enforcement personnel had conducted visual

15:22:54  4   surveillance of the vehicle?

15:22:56  5       A.   Correct.

15:22:57  6       Q.   Did that include occasions when you or other law

15:23:01  7   enforcement had made observations about the vehicle

15:23:03  8   related to the pole camera?

15:23:05  9       A.   Yes, ma'am.

15:23:05  10      Q.   Did it also include information that you had

15:23:10  11  acquired from other sources, the cooperating individuals

15:23:13  12  or cooperating sources as well as other law enforcement

15:23:16  13  personnel?

15:23:17  14      A.   Yes.

15:23:18  15      Q.   And in the affidavits that you submitted to Judge

15:23:21  16  Welch, did you specifically identify and reference the

15:23:26  17  sources of the information that you had obtained related

15:23:31  18  to Steven Hohn and his vehicle that this GPS tracker was

15:23:36  19  attached to?

15:23:39  20      A.   I did, the confidential sources.

15:23:42  21      Q.   Or any of the information, did you in this

15:23:44  22  affidavit identify where you had acquired the

15:23:49  23  information, not necessarily naming the people by name,

15:23:52  24  but that -- that -- where you had acquired the

15:23:54  25  information?

15:23:55  1    A.  Yes.

15:24:46  2    Q.  In connection with the tracker that was attached

15:24:49  3    to the vehicle, if we extract out that information,

15:24:56  4    Deputy Williams, just take it and set it off to the

15:25:00  5    side, was there anything that that tracker provided to

15:25:08  6    you alone that created a situation where you were

15:25:17  7    relying only on that information from the tracker as it

15:25:22  8    relates to the criminal involvement of Steven Hohn?

15:25:26  9            MR. CAMPBELL:  Your Honor, I would object as

15:25:28  10   to -- the question calls for speculation.  At this point

15:25:31  11   in time, we have documents, we have the testimony

15:25:33  12   relative to the officer.  I believe the question

15:25:36  13   propounded by counsel would call for speculation on the

15:25:39  14   part of the witness.

15:25:40  15           MS. MOREHEAD:  It doesn't, Judge.  He knows

15:25:42  16   what the information was that he got from the tracker.

15:25:46  17   My question is, is there anything that that tracker gave

15:25:50  18   him that he didn't also have from some other source in

15:25:56  19   this investigation, and I -- I think that's a very

15:25:59  20   important fact for the court's analysis on the

15:26:04  21   suppression issue.

15:26:08  22           MR. CAMPBELL:  Your Honor, again, I think

15:26:11  23   we've had the deputy testify in detail, counsel has

15:26:14  24   inquired and shown that everything referenced in the

15:26:17  25   affidavit was in fact shown back to its source, I think

NANCY MORONEY WISS, CSR, RMR, FCRR

15:26:22  1    it's very clear, and this calls for speculation on the

15:26:26  2    part of the officer as to whether or not there was

15:26:29  3    anything independent in there.  I think it's very clear

15:26:32  4    from the affidavits that they speak for themselves, and

15:26:35  5    that would just be speculation on the part of the

15:26:37  6    witness.

15:26:39  7                 THE COURT:  I'm not sure in regards to the

15:26:42  8    question that was asked.  I understand the objection.

15:26:47  9    The question seems to be, was there anything that the

15:26:49  10   tracker provided you alone that created a situation

15:26:52  11   where you were relying only on that information from the

15:26:56  12   tracker as it relates to the criminal involvement of

15:26:59  13   Steven Hohn.  The objection is hearsay.

15:27:08  14                 MS. MOREHEAD:  No, I think his objection was

15:27:10  15   that it was speculative.

15:27:11  16                 THE COURT:  Sorry, the objection is

15:27:13  17   speculative.  Do you understand the question that's

15:27:19  18   being asked of you?

15:27:20  19                 THE WITNESS:  Yes, sir.

15:27:23  20                 THE COURT:  In light of the objection, the

15:27:26  21   court's going to sustain it and ask that there be maybe

15:27:29  22   some foundation laid in regards to where he gained this

15:27:32  23   information.

15:27:34  24   BY MS. MOREHEAD:

15:27:34  25       Q.  Okay.  Deputy Williams, are you fully aware of

15:27:38 1  all of the information that was acquired from the

15:27:41 2  tracker that was attached to Steven Hohn's vehicle in

15:27:46 3  this case?

15:27:47 4      A.   Yes, I am.

15:27:48 5      Q.   And so, being familiar with what that information

15:27:52 6  is, are you able to analyze it in connection with all of

15:27:58 7  the other information that you obtained in this case?

15:28:02 8      A.   Yes.

15:28:03 9      Q.   And did that include from the various sources

15:28:06 10  that we've all ready mentioned, the visual surveillance,

15:28:09 11  the pole camera surveillance as well as information you

15:28:15 12  acquired from individuals, cooperating defendants or

15:28:21 13  cooperating sources or other law enforcement personnel?

15:28:25 14      A.   Yes.

15:28:26 15      Q.   And as those two sources relate, you got the GPS

15:28:32 16  tracker on one side and all the other information on the

15:28:36 17  other; is there anything at all that you gleaned from

15:28:42 18  the GPS tracker on Mr. Hohn's vehicle that you did not

15:28:50 19  receive also from one of those other sources?

15:28:54 20          MR. CAMPBELL:   I'm going to again set forth

15:28:56 21  my objection at this time, Your Honor.   The government

15:28:58 22  has succinctly argued in their brief in response to my

15:29:03 23  motion that the affidavit should have been upheld

15:29:11 24  regardless of the GPS information, and clearly, that is

15:29:17 25  going back and trying to read the mind of the judge who

15:29:20   1    signed that at the time, and the question calls for the

15:29:24   2    officer to speculate as we sit here today that there's

15:29:29   3    some scintilla, there's some iota of evidence that was

15:29:33   4    different.  Certainly, they wouldn't have placed the

15:29:36   5    trackers on the vehicles if they didn't obtain some

15:29:40   6    independent information.  Otherwise, they would have

15:29:42   7    been redundant and superfluous.

15:29:46   8             MS. MOREHEAD:  Well, that's not necessarily

15:29:48   9    true.  Law enforcement always utilize multiple methods

15:29:52  10    in investigations.  Sometimes, it is redundant and

15:29:55  11    repetitive, but there's a reason for that, because it

15:29:59  12    might serve to corroborate other information.  But we go

15:30:05  13    back to the question that I asked Deputy Williams is,

15:30:08  14    setting aside the GPS information, was there anything

15:30:11  15    that law enforcement got from the GPS tracker that they

15:30:16  16    didn't get from some other source, and that is a very

15:30:19  17    important question that has to be answered and

15:30:23  18    addressed.  I'm sure he doesn't want that addressed or

15:30:26  19    answered so he can get up and say, well, we don't know

15:30:28  20    if there was other information.  But this investigator

15:30:32  21    knows whether there was or there wasn't.  What -- what

15:30:37  22    he could look at now, standing back, and if there was

15:30:41  23    information that came from only the tracker, we need to

15:30:44  24    know what that was so that the court can analyze it to

15:30:48  25    see if that can be extracted from the overall evidence

15:30:55  1   that was obtained in this case.  And that's -- that's

15:30:58  2   what we're going through.  It doesn't -- I'm not going

15:31:00  3   to the mindset of the judge that signed the warrant.

15:31:04  4   That is one of the issues that I addressed in my

15:31:09  5   response to his motion, and I'll address that in my

15:31:13  6   arguments to the court, but this goes -- this is a fact

15:31:16  7   question.  This is not a speculation question.  This is

15:31:19  8   a fact based question, based upon his knowledge of the

15:31:23  9   investigation.

15:31:25  10          THE COURT:  Anything else?

15:31:26  11          MR. CAMPBELL:  I think I stand by what I

15:31:31  12  said before, Your Honor.

15:31:31  13          THE COURT:  Court's going to overrule the

15:31:33  14  objection.  That is actually one of the issues before

15:31:35  15  the court.  The witness is on the stand.  He can

15:31:38  16  testify.  I don't know his answer to the question he's

15:31:41  17  been asked, but if he does answer that affirmatively,

15:31:47  18  then he's going to be available for cross-examination,

15:31:51  19  but I think foundation's been laid for him to be asked

15:31:55  20  the question.  Objection's overruled.

15:31:57  21  BY MS. MOREHEAD:

15:31:57  22      Q.  Can you answer that question, Deputy Williams?

15:32:00  23      A.  Yes.  All the information that has been received

15:32:03  24  with the GPS tracker in reviewing it, what we utilized,

15:32:07  25  we have been able to confirm that information through

15:32:11    1    all other sources, whether it be cooperating defendants,

15:32:16    2    through our investigation, confidential sources, or

15:32:20    3    visual surveillance itself, we've been able to confirm

15:32:25    4    all that information that we would have gathered with

15:32:29    5    the GPS tracker.

15:32:30    6        Q.   And so, independent of the GPS tracker on Steven

15:32:34    7    Hohn's vehicle, there -- there was -- and I think

15:32:39    8    Mr. Campbell hit the nail on the head, the -- the

15:32:44    9    information from the GPS tracker was nothing more than

15:32:48   10    duplicitous, and was actually added to, I guess, the

15:33:00   11    work that you did, and you got no additional information

15:33:02   12    from it, is that safe to say?

15:33:05   13        A.   Yes.  It was kind of a duplicating the

15:33:09   14    information.  Although initially we may have got some

15:33:13   15    information, we were able to confirm that information,

15:33:16   16    and it became very valuable when talking to cooperating

15:33:20   17    defendants to be able to substantiate what the

15:33:24   18    information that they gave us.

15:33:25   19        Q.   But aside from their information, the tracking

15:33:29   20    information did not aid -- doesn't give you anything

15:33:34   21    else other than confirming what you found out otherwise?

15:33:38   22        A.   Correct.

15:33:40   23             MS. MOREHEAD:  Judge, that's all I have of

15:33:42   24    this witness.

15:33:46   25             THE COURT:  Cross-examination?

| | |
|---|---|
| 15:33:58 | 1 |
| 15:33:58 | 2 |
| 15:34:03 | 3 |
| 15:34:05 | 4 |
| 15:34:09 | 5 |
| 15:34:14 | 6 |
| 15:34:22 | 7 |
| 15:34:27 | 8 |
| 15:34:28 | 9 |
| 15:34:29 | 10 |
| 15:34:44 | 11 |
| 15:34:48 | 12 |
| 15:34:48 | 13 |
| 15:34:49 | 14 |
| 15:34:56 | 15 |
| 15:35:00 | 16 |
| 15:35:00 | 17 |
| 15:35:01 | 18 |
| 15:35:06 | 19 |
| 15:35:10 | 20 |
| 15:35:12 | 21 |
| 15:35:14 | 22 |
| 15:35:21 | 23 |
| 15:35:26 | 24 |
| 15:35:29 | 25 |

CROSS EXAMINATION

BY MR. CAMPBELL:

Q.   Deputy Williams, we've obviously had these
exchanges relative to the information from the tracker
and its importance.  You received information from the
tracker about the movements of specifically Mr. Hohn's
black F-150 vehicle that no law enforcement officer saw,
is that correct?

A.   That would be correct.

Q.   The reason for using the tracker is to observe in
a cyber fashion the vehicle when no human eyes are on
it, is that correct?

A.   Correct.

Q.   You testified you then used that information to
confirm and substantiate other information you have, is
that correct?

A.   Yes, sir.

Q.   And you used that information and confirm it
later, and use it when speaking to cooperating
witnesses, is that correct?

A.   Could you re-ask the question?

Q.   You also then use that information when you're
talking to the cooperating witnesses to confirm back to
other information you have.  Is that what you testified
to?

NANCY MORONEY WISS, CSR, RMR, FCRR

15:35:30  1      A.   We are able to -- when we receive information

15:35:33  2   from it, it substantiates what they're telling us, yes,

15:35:37  3   sir.

15:35:37  4      Q.   So, it's helpful?

15:35:39  5      A.   To -- to substantiate what they're saying, yes.

15:35:44  6      Q.   You use the information you got from the tracker?

15:35:48  7      A.   Yes, we use it all the time.

15:35:54  8      Q.   Deputy Williams, you indicated in answer to a

15:35:59  9   question that you had received information about the

15:36:03  10  status of the law on GPS trackers, is that correct?

15:36:07  11     A.   Yes.

15:36:08  12     Q.   Where did you receive that information from?

15:36:13  13     A.   We had -- I had done research back in 2005 when

15:36:17  14  we initially started putting the trackers on.

15:36:21  15  Throughout my career, we have kept in contact with US

15:36:25  16  Attorneys, the US Attorney's office, the District Court

15:36:30  17  of Johnson County, the Johnson County District

15:36:34  18  Attorney's office in confirming with them what would be

15:36:37  19  required as far as pertaining to GPS trackers.

15:36:42  20     Q.   But you said you'd received information, so

15:36:44  21  you're saying that you received information from

15:36:48  22  prosecutors, from independent research, and from

15:36:51  23  training, is that correct?

15:36:52  24     A.   Correct.

15:36:53  25     Q.   In that information, had you also received

15:36:56  1    information that there was a split of authorities

15:36:59  2    relative to trackers?

15:37:01  3        A.   I'm sorry, can you --

15:37:04  4        Q.   Were you aware that some courts had ruled you had

15:37:06  5    to have a warrant to have a tracker?

15:37:08  6        A.   I knew that there were -- there were states that

15:37:11  7    had ruled that, that they wanted a warrant for a

15:37:15  8    tracker, yes, sir.

15:37:16  9        Q.   But you based your decision on states that had

15:37:20  10   not required it?

15:37:22  11       A.   That is between the state and the federal

15:37:26  12   guidelines at that time.  That's what I based my

15:37:28  13   decision on.

15:37:29  14       Q.   Federal guidelines from the Department of

15:37:30  15   Justice?

15:37:32  16       A.   That is -- yes, from when my time with DEA, that

15:37:36  17   they would not need a warrant.

15:37:38  18       Q.   So, you didn't receive it from the courts of the

15:37:40  19   United States.  You received it from the prosecutors of

15:37:43  20   the United States?

15:37:43  21       A.   Correct.

15:37:44  22       Q.   But even during that time, you were aware that

15:37:48  23   there were two different lines of cases, one saying you

15:37:53  24   didn't need a warrant and one saying you did?

15:37:55  25       A.   Yes, that information was out there.

15:37:57   1      Q.   You testified that you were aware of the Jones

15:38:01   2   decision that came down in January of this year?

15:38:04   3      A.   Yes, sir.

15:38:04   4      Q.   And it, in fact, now requires and found in favor

15:38:09   5   of those states that said a search warrant is necessary,

15:38:12   6   is that correct?

15:38:12   7      A.   Yes, sir.

15:38:14   8           MS. MOREHEAD:   Well, Judge, I'm going to

15:38:16   9   object.

15:38:16   10          MR. CAMPBELL:   I will withdraw that.  I

15:38:18   11  agree.

15:38:19   12          MS. MOREHEAD:   Because there are limits on

15:38:21   13  Jones.  Jones doesn't say you always need a tracker.

15:38:23   14          MR. CAMPBELL:   It was a poorly worded

15:38:25   15  question, Your Honor.  I will withdraw it.  I believe

15:38:27   16  counsel is right to object.

15:38:31   17  BY MR. CAMPBELL:

15:38:32   18     Q.   Deputy Williams, when you placed the trackers on

15:38:36   19  the vehicles, I would like to go into some detail.

15:38:42   20  Where did you -- where on the vehicle did you place the

15:38:45   21  trackers?

15:38:47   22     A.   On the body of the vehicle.

15:38:53   23     Q.   Let's be a little more specific.  Where at on the

15:38:57   24  vehicle?

15:38:58   25     A.   We find different locations on the vehicle.  The

15:39:01 1    trackers on these particular vehicles were placed on the

15:39:03 2    bed area of the vehicle.

15:39:08 3        Q.   Now, when you say the bed area of the truck,

15:39:14 4    would you go up to the truck, get on your knees, or lay

15:39:18 5    down and reach under the truck and place the tracker?

15:39:20 6        A.   Yes, sir.

15:39:21 7        Q.   Could you precisely tell the court how you do

15:39:25 8    that?

15:39:27 9        A.   Where I put it or how I go about going up to the

15:39:31 10   vehicle?

15:39:31 11       Q.   Both.

15:39:34 12       A.   A little disconcerting telling our -- our secrets

15:39:38 13   of where we put stuff.  Gives people the idea where to

15:39:40 14   look for 'em.

15:39:41 15       Q.   Let me clarify it.  I'm not concerned how you got

15:39:44 16   there.  I'm concerned about what you do when you get to

15:39:46 17   the vehicle.

15:39:47 18       A.   When I get to the vehicle, I walk up to the

15:39:49 19   vehicle.  Number one, before we ever place one on a

15:39:51 20   vehicle, we have a vehicle that is somewhat similar to

15:39:54 21   that vehicle.  We generally try to find a year, make and

15:39:57 22   model identical to the vehicle that we're going to place

15:39:59 23   a tracker on, so before we ever walk up to the vehicle,

15:40:03 24   we know where we're going to place the tracker, so that

15:40:05 25   we're expedient in what we're doing, so we're not

15:40:10  1   searching for a place to put it.  When I walk up to a

15:40:14  2   vehicle, I just walk down the street, walk up -- walk

15:40:20  3   straight up to the vehicle.  I'll slide down on to my

15:40:23  4   hands and knees, or I will slide on to my back, roll

15:40:27  5   under the vehicle.  I'll place the tracker in the

15:40:29  6   position that I want it.  I roll back out, stand up, I

15:40:33  7   walk away.

15:40:35  8       Q.  So, you go completely under the vehicle.  The

15:40:37  9   trackers are placed not on the outside of the vehicle,

15:40:40  10  but underneath or inside the body, is that correct?

15:40:43  11      A.  Some -- it depends on what vehicle it is.  These

15:40:46  12  vehicles here, I did not have to roll all the way

15:40:48  13  underneath.  I could -- I could maintain, yes, with my

15:40:51  14  head, my shoulders under the vehicle, yes.  Was the rest

15:40:54  15  of my body?  No, sir.

15:40:55  16      Q.  But you don't put it on the outside?

15:40:58  17      A.  No, sir.

15:40:58  18      Q.  Deputy Williams, you've been at this for

15:41:06  19  23 years.  You've had training from your initial time

15:41:09  20  with the law enforcement training center and each year

15:41:11  21  after that, is that correct?

15:41:12  22      A.  Correct.

15:41:13  23      Q.  And as a general statement of your training, you

15:41:18  24  have been taught it's important to include what's

15:41:20  25  important in your reports, is that correct?

15:41:22  1    A.  Yes, sir.

15:41:22  2    Q.  And these affidavits that have been admitted as

15:41:27  3  State's Exhibit -- or excuse me, Government's Exhibits 1

15:41:30  4  and 2 are up to 26 to 28 pages long, is that correct?

15:41:37  5    A.  Yes, sir.

15:41:37  6    Q.  And you tried to include everything that was

15:41:40  7  important in those, is that correct?

15:41:41  8    A.  Yes, sir.

15:41:42  9    Q.  And what you included in those was important, is

15:41:46  10  that correct?

15:41:46  11    A.  Yes.

15:41:47  12    Q.  Deputy Williams, there were times that the

15:42:01  13  vehicles, or the vehicle in question traveled back and

15:42:05  14  forth between certain locations, is that correct?

15:42:10  15    A.  Yes, sir.

15:42:10  16    Q.  And some of those, you listed out for the court,

15:42:14  17  8200 Kaw, 1326 Main in Eudora, those types of places

15:42:19  18  where the vehicle went back and forth frequently?

15:42:22  19    A.  Correct.

15:42:22  20    Q.  And in fact, the individuals there were either

15:42:27  21  where Mr. Hohn was living, Mr. Hohn's family, or

15:42:32  22  Mr. Hohn's friends, weren't they?

15:42:34  23    A.  That is information that was received.

15:42:37  24    Q.  So, the information you had was that Mr. Hohn

15:42:40  25  traveled frequently between his friend's house, and

15:42:43   1  either from his ex-wife's or his wife's, excuse me, to

15:42:47   2  another location, or from another location to his

15:42:49   3  wife's?

15:42:50   4      A.  That would be correct.  We also had information

15:42:52   5  that there was drug activity going on at all those

15:42:55   6  locations.

15:42:57   7      Q.  Deputy Williams, there was a little bit of

15:43:02   8  discrepancy in your testimony relative to the time you

15:43:07   9  came back into this case.  You had indicated that you

15:43:15  10  returned around March of 2011, is that correct?

15:43:19  11      A.  Yes, I believe that would be correct.

15:43:21  12      Q.  But then you testified you got active in the case

15:43:24  13  in August of 2011.  Which of those is correct?

15:43:28  14      A.  I came back to the sheriff's office in March of

15:43:31  15  2011.  At that time, Deputy Denton was the lead officer

15:43:37  16  on that case.  I was not really actively involved in it.

15:43:42  17  I knew about the case, I knew about the case from 2010

15:43:48  18  and had a brief involvement.  I never did -- I don't

15:43:52  19  believe I ever did any surveillance down there through

15:43:54  20  2010.  In May of 2011, I had surgery and was out on

15:44:02  21  light duty until August of -- 17th or 16th of 2011.  So,

15:44:09  22  if I was involved in the case from March until May 10th,

15:44:14  23  my involvement with that case was very minimal of what I

15:44:18  24  did.

15:44:18  25      Q.  So, to clarify, you came back essentially to work

15:44:22   1   for the sheriff's department, although you'd always been

15:44:25   2   employed with them, but you came back more to work with

15:44:28   3   them in March of 2011, but you became more involved in

15:44:30   4   this case in August of 2011, is that correct?

15:44:32   5      A.   That is correct.

15:44:33   6      Q.   During your testimony on direct, you indicated

15:44:42   7   that attempting surveillance on the location in Gardner,

15:44:50   8   126 Manor Place, was very difficult because it was a cul

15:44:54   9   de sac, is that correct?

15:44:54   10      A.   Yes, sir.

15:44:55   11      Q.   And later, you testified that surveillance on

15:44:59   12   Mr. Hohn while driving was -- use your words --

15:45:04   13   virtually impossible due to the way he drove, is that

15:45:08   14   correct?

15:45:08   15      A.   Correct.

15:45:11   16      Q.   The use of the tracking devices overcame those

15:45:14   17   obstacles, didn't it?

15:45:15   18      A.   They assisted us, yes, sir.

15:45:17   19      Q.   It made it substantially easier to track the

15:45:24   20   vehicle in the cul de sac with the tracker, is that

15:45:27   21   correct?

15:45:27   22      A.   Yes.

15:45:28   23      Q.   And it made it possible to track the vehicle,

15:45:32   24   regardless of how Mr. Hohn drove, with the tracker?

15:45:36   25      A.   That would be correct.

15:45:40    1      Q.   Understanding I'm asking you to go back a long

15:45:43    2   time on this, Mr. Williams, but in November, the first

15:45:47    3   part of November of 2011 when you drafted that

15:45:52    4   affidavit, did you type it up, or did you dictate it and

15:45:54    5   have someone draft it?

15:45:55    6      A.   No, I typed it.

15:45:56    7      Q.   Give or take, how long did it take you to draft

15:46:00    8   that document?

15:46:01    9      A.   I probably worked on it three or four days.

15:46:11   10      Q.   So, there was no emergency that you had to get

15:46:13   11   this document out in a matter of minutes or a matter of

15:46:17   12   hours, is that correct?

15:46:19   13      A.   No, sir.

15:46:20   14      Q.   You could take your time, do it properly, make

15:46:22   15   sure everything important was included?

15:46:25   16      A.   Yes, sir.

15:46:25   17      Q.   At any time, from the time you came back in March

15:46:34   18   of 2011 or became involved in this case in August of

15:46:37   19   2011, you could have taken that same time and done this

15:46:41   20   affidavit, couldn't you?

15:46:44   21      A.   Yes.

15:46:48   22      Q.   And you certainly could have done a similar

15:46:50   23   affidavit prior to placing the battery powered GPS

15:46:54   24   tracking devices, couldn't you?

15:46:55   25      A.   Yes, sir.

| | |
|---|---|
| 15:46:56 | 1 |
| 15:47:00 | 2 |
| 15:47:02 | 3 |
| 15:47:05 | 4 |
| 15:47:05 | 5 |
| 15:47:07 | 6 |
| 15:47:08 | 7 |
| 15:47:09 | 8 |
| 15:47:09 | 9 |
| 15:47:11 | 10 |
| 15:47:15 | 11 |
| 15:47:19 | 12 |
| 15:47:24 | 13 |
| 15:47:29 | 14 |
| 15:47:31 | 15 |
| 15:47:31 | 16 |
| 15:47:36 | 17 |
| 15:47:39 | 18 |
| 15:47:40 | 19 |
| 15:47:41 | 20 |
| 15:47:44 | 21 |
| 15:47:48 | 22 |
| 15:47:52 | 23 |
| 15:47:55 | 24 |
| 15:47:55 | 25 |

Q.   There was no emergency that had to be done immediately, was there?

A.   Not that I'm aware of.

MR. CAMPBELL:   I have nothing further of the witness, Your Honor.

MS. MOREHEAD:   Just a little bit of follow-up, Judge.

RE-DIRECT EXAMINATION

BY MS. MOREHEAD:

Q.   Deputy Williams, with regards -- I want to go back to the few questions that Mr. Campbell asked about the tracker.  I think what I heard you say is the tracker assisted in the investigation in -- in several different ways, is that right?

A.   Correct.

Q.   And he said -- I think Mr. Campbell asked, did it make it easier?  And you said, yeah, it did make it easier.

A.   Correct.

Q.   And he specifically asked you about the cul de sac, that it -- it made it easier monitoring the car -- the vehicle at that location on the cul de sac. However, is that the same location that you had the pole camera up to?

A.   Yes, we had the pole camera there, and even if we

15:47:59  1  saw the -- if the trackers showed that it was at that

15:48:02  2  location, being human, you always want to confirm it,

15:48:06  3  other than the tracker, that the tracker wasn't found,

15:48:10  4  it's sitting in the driveway, it's been placed in the

15:48:12  5  trash can.  We would always pull the pole camera up and

15:48:15  6  look, and we could confirm that the vehicle was there.

15:48:18  7  We also utilized that pole camera to observe other

15:48:21  8  vehicles that would pull down in the cul de sac.

15:48:25  9      Q.  As far as interviews of individuals, you said --

15:48:34  10  I think it was actually Mr. Campbell said it assisted

15:48:37  11  you, and you indicated that it assisted you only in as

15:48:42  12  much as it served to corroborate information that you

15:48:45  13  got from cooperators, is that right?

15:48:47  14      A.  Correct.

15:48:48  15      Q.  And just so I'm clear, or -- let's -- let me ask

15:48:53  16  you to explain what you mean by that.  How -- how did --

15:48:57  17  how -- how did you actually use the tracker in

15:49:00  18  connection with interviews?

15:49:01  19      A.  In talking with people, you talk to them, and

15:49:05  20  they tell you that a certain activity happened on a

15:49:07  21  certain day, that they went to a certain location.  We

15:49:12  22  were able to confirm that with the tracker, and we

15:49:16  23  knew -- we actually knew about the information, and it

15:49:21  24  confirmed it.  Whenever they would say the information

15:49:23  25  or we would hear that information, we'd go back, review

15:49:26   1   the tracker information, and we could confirm that that

15:49:30   2   is indeed where they went, or you know, they were in

15:49:32   3   that location, which would validate what the person was

15:49:37   4   saying to us.

15:49:38   5        Q.   In other words, it would assist you in

15:49:41   6   determining their credibility, whether they were being

15:49:44   7   truthful or not?

15:49:45   8        A.   Correct.

15:49:46   9        Q.   And -- and were there ever any occasions where

15:49:50   10   you would have used the tracker in your interviews, the

15:49:55   11   questions, or -- in other words, would you say, okay, on

15:49:59   12   this day, we know Steven Hohn was here?  Tell us about

15:50:03   13   that.  In other words, did you, in the -- in the

15:50:05   14   reverse, use the tracker to extract information, or did

15:50:09   15   you just use it to corroborate information?

15:50:12   16        A.   There may have been occasions where we -- we

15:50:15   17   actually used that information, and were able to get

15:50:18   18   somebody to -- to tell us a location they were at and

15:50:21   19   why.

15:50:22   20        Q.   Without specifically, I assume, referring to

15:50:26   21   where that information came from?

15:50:28   22        A.   Correct.  We would never tell them where it was

15:50:31   23   that it came from.

15:50:32   24        Q.   In connection with the search warrant affidavits

15:50:38   25   that you applied for, though, any information that you

| | | |
|---|---|---|
| 15:50:41 | 1 | were utilizing as it related to the tracker, you |
| 15:50:46 | 2 | specifically referenced that within the affidavit, is |
| 15:50:49 | 3 | that right? |
| 15:50:49 | 4 | A.  Yes.  Yes, ma'am. |
| 15:50:50 | 5 | Q.  In other words, if the -- and I think you |
| 15:50:53 | 6 | identify -- identify it as an ST 820 electronic tracking |
| 15:50:58 | 7 | device, is that right? |
| 15:50:59 | 8 | A.  Correct. |
| 15:50:59 | 9 | Q.  Also you used an EDT, is that right? |
| 15:51:05 | 10 | A.  Yeah, ETD. |
| 15:51:06 | 11 | Q.  ETD? |
| 15:51:07 | 12 | A.  Electronic tracking device. |
| 15:51:10 | 13 | Q.  So, anywhere that you used information in this |
| 15:51:12 | 14 | affidavit from that tracker, you would have identified |
| 15:51:15 | 15 | that for the judge? |
| 15:51:16 | 16 | A.  Correct. |
| 15:51:18 | 17 | MS. MOREHEAD:  That's all I have.  Thank |
| 15:51:20 | 18 | you. |
| 15:51:20 | 19 | THE COURT:  Any re-cross? |
| 15:51:22 | 20 | MR. CAMPBELL:  None, Your Honor. |
| 15:51:23 | 21 | THE COURT:  If there's nothing else of the |
| 15:51:24 | 22 | witness, please step down.  Return to your seat.  Any |
| 15:51:38 | 23 | other evidence from the government? |
| 15:51:40 | 24 | MS. MOREHEAD:  No, Judge.  That's all the |
| 15:51:42 | 25 | evidence we have. |

| | |
|---|---|
| 15:51:43 | 1 |
| 15:51:44 | 2 |
| 15:51:46 | 3 |
| 15:51:50 | 4 |
| 15:51:53 | 5 |
| 15:51:55 | 6 |
| 15:51:58 | 7 |
| 15:52:00 | 8 |
| 15:52:03 | 9 |
| 15:52:05 | 10 |
| 15:52:11 | 11 |
| 15:52:17 | 12 |
| 15:52:22 | 13 |
| 15:52:30 | 14 |
| 15:52:34 | 15 |
| 15:52:44 | 16 |
| 15:52:48 | 17 |
| 15:52:56 | 18 |
| 15:53:01 | 19 |
| 15:53:06 | 20 |
| 15:53:11 | 21 |
| 15:53:15 | 22 |
| 15:53:24 | 23 |
| 15:53:29 | 24 |
| 15:53:33 | 25 |

THE COURT:  Any evidence from defendant?

MR. CAMPBELL:  No, Your Honor.

THE COURT:  Any argument counsel wants to make in regards to -- I'm familiar with the arguments all ready that have been made, but now that there's been evidence provided to the court, if you want to highlight some of that as relates to previous arguments, or add any additional new arguments, please do so.

MS. MOREHEAD:  Judge, I want to specifically reference the two affidavits that have been presented to you, and the reason that I want to reference those is, obviously, one of the arguments made by the defendant is, even after or -- or in connection with these search warrants, they should not be -- the tracker information from November 8th moving forward to December 23rd should not be used, because there was information contained in the initial affidavit that supported the probable cause which the tracker information was utilized in.  And the argument that I made in my response was, even extracting out the GPS tracker information which had been acquired between July 24th and -- and frankly, November 10th, prior to the warrant being implemented, the affidavit, it's clear on what that information was, and I believe extracting out that information, there still would have been probable cause for Judge Welch to sign this warrant

| | | |
|---|---|---|
| 15:53:37 | 1 | to place that tracker on Steven Hohn's vehicle, and -- |
| 15:53:41 | 2 | and that's the test that you have to undertake in order |
| 15:53:45 | 3 | to look at the tracking information.  And I specifically |
| 15:53:49 | 4 | want to reference within Government's Exhibit Number 1 |
| 15:53:56 | 5 | those paragraphs where the tracker is mentioned, and I |
| 15:54:00 | 6 | think it mentions just in Paragraph Six that the tracker |
| 15:54:03 | 7 | was placed on there.  Paragraph Nine mentions |
| 15:54:08 | 8 | information from the tracker.  Paragraph Ten, part of |
| 15:54:17 | 9 | that paragraph includes information from the tracker, |
| 15:54:21 | 10 | but there's also information contained in that |
| 15:54:25 | 11 | particular paragraph about visual surveillance |
| 15:54:29 | 12 | independent of the tracker.  There's information in |
| 15:54:32 | 13 | Paragraph 11 related to the tracker.  There is a |
| 15:54:38 | 14 | portion, just really the first sentence in Paragraph 14 |
| 15:54:42 | 15 | that relates to the tracker on Mr. Hohn's vehicle.  The |
| 15:54:46 | 16 | rest of that all involves visual surveillance. |
| 15:55:01 | 17 | Paragraph 36 references the tracker, and actually, the |
| 15:55:11 | 18 | last sentence of Paragraph 35 mentions an example of how |
| 15:55:18 | 19 | the EDT -- ETD -- ETD was used to corroborate other |
| 15:55:25 | 20 | information.  But again, there was still information |
| 15:55:28 | 21 | independent of the ETD.  Paragraph 52, there is some |
| 15:55:41 | 22 | portions of that that are based on the tracker, but |
| 15:55:44 | 23 | there is independent verification of that by way of |
| 15:55:48 | 24 | visual surveillance as well as the pole camera that |
| 15:55:53 | 25 | would have been located at 8200 Kaw Drive.  There are |

NANCY MORONEY WISS, CSR, RMR, FCRR

15:56:03  1    several portions involving that particular paragraph
15:56:07  2    that includes information on the tracker, but there's
15:56:10  3    also other information that doesn't.  Aside from those
15:56:14  4    few paragraphs, all of the other information contained
15:56:21  5    in this 31 page affidavit -- I think it's 31 pages -- is
15:56:29  6    received from other sources of information, and so, if
15:56:34  7    we extract out the information from the tracker, I would
15:56:41  8    suggest that there would have still been probable cause
15:56:44  9    to include -- or to authorize the court order on the
15:56:55  10   1997 Ford F-150 pick-up.  As you can see from
15:57:00  11   Government's Exhibit Number 2, all of the information
15:57:03  12   contained in that affidavit as it relates to the tracker
15:57:10  13   would have been information that was authorized
15:57:14  14   post-November 10th after the search warrant was
15:57:19  15   authorized, and any reference to the tracker information
15:57:24  16   was by way of a court order.  So, if you find that there
15:57:31  17   was sufficient information in the initial affidavit,
15:57:36  18   independent of the tracker information, to have
15:57:39  19   authorized the tracker warrant being issued, then
15:57:45  20   likewise, there would have been sufficient probable
15:57:49  21   cause in the secondary or the extension search warrant
15:57:53  22   which was issued on December 8th, 2011.  So, with that
15:58:02  23   information, Judge, we believe that clearly, the tracker
15:58:13  24   warrant should be upheld from December -- or from
15:58:18  25   November 10th through December 23rd, 2011, which there

15:58:21  1    was a court order on that.  And then, Judge, what I'm

15:58:26  2    also asking you to do is to find that the officers acted

15:58:33  3    in reasonable good faith reliance upon the state of law

15:58:45  4    that was in effect when they had the GPS tracker on the

15:58:50  5    car.  You know, I mentioned -- and in Mr. Campbell's

15:58:55  6    motion, the only case that he relies upon is Jones, and

15:59:01  7    Jones is distinguishable in a number of ways.  First of

15:59:07  8    all, Jones was a situation where they placed a tracker

15:59:11  9    on a car 24/7, and it was for a four-month period of

15:59:17  10   time, followed the vehicle even to private locations

15:59:20  11   over this extended period of time, and the Supreme Court

15:59:24  12   said under those facts, the Fourth Amendment certainly

15:59:27  13   applies.  The tracker that was utilized in this case was

15:59:31  14   utilized in a much different fashion.  First of all, it

15:59:34  15   was not continual.  There was a week between July 24th

15:59:42  16   and August 1st, there was a week between August 17th and

15:59:45  17   August 24th, and then from August 26th to November 10th,

15:59:50  18   there was also monitoring that occurred.  And as

15:59:58  19   indicated from Deputy Williams, there was nothing that

16:00:00  20   this tracker received by way of information aside from a

16:00:06  21   single event that he identified where, arguably, the car

16:00:12  22   was in a private lo-- or the truck was in a private

16:00:15  23   location.  All other times, the GPS was obtaining or

16:00:20  24   receiving information that would have been visual from

16:00:28  25   the public roadways or from a location where the

| | | |
|---|---|---|
| 16:00:33 | 1 | individuals were otherwise authorized to be, and I |
| 16:00:36 | 2 | mentioned to you the Knotts case, and Mr. Campbell said, |
| 16:00:40 | 3 | well, there was the split of authority, but as of clear |
| 16:00:46 | 4 | up 'til Jones and even now, Knotts was good law, Knotts |
| 16:00:51 | 5 | applies, and in a situation where a tracker is placed |
| 16:00:59 | 6 | in -- in that situation, it was placed in a device that |
| 16:01:03 | 7 | was loaded onto a vehicle, and they monitored the |
| 16:01:09 | 8 | movements of -- of that vehicle on public roadways, and |
| 16:01:14 | 9 | that's nothing more than the officers were able to glean |
| 16:01:18 | 10 | in this case. I mention that first and foremost. And |
| 16:01:25 | 11 | then secondarily, as I indicated, the state of law as it |
| 16:01:30 | 12 | applied up until January of 2012 was that some -- |
| 16:01:35 | 13 | someplace said you -- you might need a tracker -- a |
| 16:01:39 | 14 | warrant, others said, no, you don't. And certainly, |
| 16:01:43 | 15 | with regards to the state of law in our district, it -- |
| 16:01:48 | 16 | it did not. There was not that indication. The Tenth |
| 16:01:54 | 17 | Circuit didn't have any guidance on this issue. So, the |
| 16:01:58 | 18 | officers, the deputies, the law enforcement personnel |
| 16:02:01 | 19 | that were acting in good faith up 'til Jones certainly |
| 16:02:11 | 20 | should be able to make claim that they were acting in |
| 16:02:15 | 21 | nothing but reasonable good faith. Even now, Jones does |
| 16:02:21 | 22 | not tell us that we have to have a tracker if we're |
| 16:02:25 | 23 | going -- or a warrant if we're going to put a tracker on |
| 16:02:27 | 24 | a vehicle. I think most law enforcement, most |
| 16:02:32 | 25 | prosecution-related investigations are taking that |

| | | |
|---|---|---|
| 16:02:38 | 1 | posture where we are doing that now out of more of an |
| 16:02:42 | 2 | abundance of caution than anything, but Jones certainly |
| 16:02:46 | 3 | does not dictate that we have to do that.  I believe |
| 16:02:49 | 4 | there are some situations where there would not need to |
| 16:02:55 | 5 | be a warrant.  Jones was more focused on really the |
| 16:03:01 | 6 | overreaching that occurred there, the length of time |
| 16:03:04 | 7 | that occurred, and that case, they actually had a |
| 16:03:07 | 8 | warrant, and they went beyond the parameters that the |
| 16:03:10 | 9 | warrant authorized, and that was another difference |
| 16:03:14 | 10 | that -- that Jones attached itself to was, hey, you have |
| 16:03:19 | 11 | this warrant, but you didn't follow what the warrant |
| 16:03:21 | 12 | said.  So, under the facts that we've presented here and |
| 16:03:28 | 13 | based upon your review of this affidavit, we believe |
| 16:03:32 | 14 | that, certainly, the GPS warrant should be upheld as |
| 16:03:39 | 15 | being legally sufficient, aside from if you want to find |
| 16:03:45 | 16 | that the tracker information should not have been |
| 16:03:47 | 17 | included, that it otherwise was legally sufficient for |
| 16:03:51 | 18 | probable cause.  And then independent of that, prior to |
| 16:03:55 | 19 | that warrant, we would ask that you find the officers |
| 16:03:58 | 20 | acted in reliance of good faith. |
| 16:04:09 | 21 | MR. CAMPBELL:  May it please the court, Your |
| 16:04:16 | 22 | Honor.  I think the government's argument to try and |
| 16:04:19 | 23 | distinguish Jones from this case is difficult from the |
| 16:04:23 | 24 | standpoint of, the way I count July to August to |
| 16:04:26 | 25 | September to October to November is in fact four months, |

| | |
|---|---|
| 16:04:31 | 1 |
| 16:04:34 | 2 |
| 16:04:39 | 3 |
| 16:04:41 | 4 |
| 16:04:47 | 5 |
| 16:04:50 | 6 |
| 16:04:54 | 7 |
| 16:04:58 | 8 |
| 16:05:01 | 9 |
| 16:05:05 | 10 |
| 16:05:09 | 11 |
| 16:05:13 | 12 |
| 16:05:18 | 13 |
| 16:05:21 | 14 |
| 16:05:25 | 15 |
| 16:05:29 | 16 |
| 16:05:31 | 17 |
| 16:05:36 | 18 |
| 16:05:39 | 19 |
| 16:05:43 | 20 |
| 16:05:45 | 21 |
| 16:05:49 | 22 |
| 16:05:52 | 23 |
| 16:05:57 | 24 |
| 16:06:00 | 25 |

and additionally, the only reason they didn't track this thing 24/7 was batteries ran out a couple of times. Additionally, Your Honor, I think in light of Jones, what we know as fact are that on 10 occasions, the officers in this case violated my client's constitutional rights by placing a tracker.  The government's argument is they should be excused from these violations of my client's constitutional rights because they didn't know any better, they acted in good faith.  But what the officer testified to and what in fact is the case, what he relied on was the prosecution telling him this.  Were the court to adhere to the government's arguments in this matter, it would be acceptable at any time where there is an issue.  So long as the Department of Justice says it's okay to do this, everything they engage in would be fine until the Supreme Courts say no.  Your Honor, had my client filed the same motion, had we had the same hearing, regardless of the court's ruling, had we followed this through to the Supreme Court prior to Jones, and if they would have made the same ruling as in Jones, the finding would be my client's rights were violated.  If after January of 2012, the government and the agencies had acted in exactly the same manner that they've acted in this matter, then at that point in time, I don't think there

16:06:02  1   would be any question that the court says, you have

16:06:04  2   violated the defendant's constitutional right, and the

16:06:06  3   matter would have to be suppressed.  What they're

16:06:09  4   essentially saying is that, some point in time between

16:06:12  5   November of 2011 and January of 2012, anybody whose

16:06:16  6   rights were violated during that period of time, they're

16:06:19  7   kind of out of luck, and I don't think that flies.

16:06:21  8   There was no exigency, Judge.  At any point in time,

16:06:26  9   they could have done this warrant.  They had -- it took

16:06:28  10  them three days to prepare the warrant.  The argument

16:06:32  11  that the government sets forth relative to the portions

16:06:36  12  of the affidavit that do not deal directly with the GPS

16:06:41  13  system are that the other items listed should save the

16:06:50  14  affidavits.  But when counsel referenced that they had

16:06:54  15  surveillance, they had personal surveillance, most of

16:06:58  16  the time, they drove to get that personal surveillance

16:07:01  17  based upon what the tracker told them to go, where the

16:07:05  18  tracker told them to go.  I don't think you can

16:07:08  19  distinguish that.  Additionally, the government listed

16:07:11  20  those just enumerable times that they used the tracker

16:07:15  21  information, but then tried to pass that off as being

16:07:18  22  less than a great portion of it.  Also, they gained

16:07:23  23  information from following the tracker and the personal

16:07:26  24  surveillance that they got to because of the tracker,

16:07:28  25  and used that information in other independent ways.  I

16:07:32  1   don't think, Your Honor, that you can separate what was

16:07:35  2   and wasn't a result, and that's why we're asking the

16:07:38  3   court to suppress these items.  Jones is very clear, and

16:07:43  4   Knotts is as well, 'cause Jones distinguished it.  In

16:07:47  5   Knotts, they didn't actually go into physically a

16:07:50  6   defendant's property.  Knotts was distinguished because

16:07:54  7   they put a tracker inside a box, and then by one mean or

16:07:57  8   another, and usually it was because the defendant

16:07:59  9   actually took that and put it into the defendant's

16:08:01  10  vehicle, and then they followed it.  In this case, as --

16:08:06  11  as Deputy Williams testified very distinctly, they

16:08:10  12  reached under the vehicle, at times, they would roll

16:08:12  13  under the vehicle.  In this case, I think he just said

16:08:14  14  he put his head and shoulders under, but he put his head

16:08:17  15  and shoulders and arms under the vehicle, and that was

16:08:19  16  specifically what Jones said was wrong.  They said, you

16:08:22  17  can't do this for four months, which was done here, that

16:08:25  18  you can't physically go under the vehicle or around the

16:08:29  19  parameters of the vehicle, which was done here, and that

16:08:32  20  if you do that, you got to have a warrant, which wasn't

16:08:35  21  done here.  There was no exigent circumstance, there was

16:08:38  22  no emergency, and as such, Your Honor, I think anything

16:08:42  23  prior to November of 2011, certainly under Jones, should

16:08:47  24  be suppressed by the court.  Further, Your Honor, I

16:08:50  25  don't think that we can distinguish what is or isn't

16:08:53  1  tainted because of that, and as a result of that, I

16:08:56  2  would ask the court to suppress the entirety of the

16:08:59  3  information obtained as a result of the GPS surveillance

16:09:02  4  in this matter.  Thank you.

16:09:06  5          THE COURT:  Anything else from the

16:09:07  6  government?

16:09:09  7          MS. MOREHEAD:  No, Judge.

16:09:10  8          THE COURT:  If there's nothing else, what

16:09:12  9  the court would like to do is take a recess at this time

16:09:14  10  to consider the arguments you've made in light of the

16:09:16  11  evidence, and then return and give a ruling.  Thank you.

16:09:24  12          (Whereupon court took a recess.  Proceedings

16:32:21  13          then continued as follows:)

16:32:21  14          THE COURT:  We're back on the record.  Court

16:34:52  15  had taken a recess to consider once again the evidence

16:34:55  16  that had been presented, which consisted of the

16:34:58  17  testimony of the witness that was called, Perry

16:35:04  18  Williams, as well as the exhibits that the government

16:35:08  19  offered and were admitted.  The court also considered

16:35:12  20  the additional arguments that were made regarding not

16:35:16  21  only the evidence but also the issues identified in the

16:35:21  22  motion to suppress as well as response, and at this

16:35:26  23  time, after having considered the evidence and the

16:35:30  24  arguments of the parties, as well on its own, the court

16:35:37  25  independently reviews the law, court is now prepared to

16:35:39  1    issue its ruling.  The key issue for the court is not

16:35:46  2    really whether the placement of the GPS device in

16:35:51  3    July 2011 to monitor defendant's truck movement was an

16:35:57  4    impermissible search.  Under Jones, it appears to the

16:36:03  5    court that it was a warrantless search with no apparent

16:36:08  6    exigent circumstances which would at least arguably make

16:36:15  7    it unreasonable.  Even if a search is unreasonable,

16:36:20  8    however, the court will not suppress evidence if the law

16:36:27  9    enforcement officials acted in good faith.  The

16:36:31  10   exclusionary rule operates to deter future

16:36:37  11   constitutional violations, not to remedy past ones.

16:36:44  12   Supreme Court has declined to apply the exclusionary

16:36:47  13   rule in a number of cases in which law enforcement has

16:36:53  14   acted with objectively reasonable reliance on a warrant,

16:36:59  15   acted in reasonable reliance on statutes that were

16:37:04  16   subsequently invalidated, and conducted a search based

16:37:09  17   on objectively reasonable reliance on binding judicial

16:37:14  18   precedent.  Courts focus on police culpability, and

16:37:21  19   should not use the, quote, harsh sanction of exclusion,

16:37:26  20   end quote, to quote, deter objectively reasonable law

16:37:34  21   enforcement activity, end quote.  It's a case of Davis

16:37:40  22   versus United States at 131 Supreme Court 2419, 2426,

16:37:50  23   2011 case.  At the time the sheriff's office initially

16:37:57  24   placed the battery operated GPS unit on defendant's

16:38:01  25   truck, the majority of circuit courts that addressed the

16:38:08  1   issue had held such conduct lawful.  Testimony from
16:38:14  2   Deputy Williams was that he was informed by prosecutors
16:38:20  3   and also in reliance of his DEA experience and/or
16:38:25  4   training that it was not improper to place a battery
16:38:32  5   powered GPS on vehicles without first securing a
16:38:39  6   warrant.  That would appear to the court that this law
16:38:43  7   enforcement officer objectively, reasonably relied on
16:38:51  8   prosecutors and DEA training, experience in order to
16:38:55  9   arrive at that opinion.  The Tenth Circuit had not
16:39:02  10  weighed in on the issue, but the Supreme Court in the
16:39:06  11  United States versus Knotts had held that, quote, a
16:39:11  12  person traveling in an automobile on public
16:39:18  13  thoroughfares has no reasonable expectation of privacy
16:39:22  14  in its movements from one place to another.  And it's
16:39:29  15  the court's belief that Jones did not overrule Knotts.
16:39:35  16  The court determines that it was objectively reasonable
16:39:38  17  for law enforcement to rely in this instance on his
16:39:43  18  sources in deciding to place a GPS device on defendant's
16:39:48  19  car without first seeking a warrant.  Further, the fact
16:39:55  20  that Deputy Williams applied for a warrant when he
16:39:58  21  sought to use the hard wired GPS appears to demonstrate
16:40:05  22  to the court a lack of culpability on the part of law
16:40:11  23  enforcement.  The court sees no deterrent value in
16:40:15  24  suppressing the evidence obtained by use of the GPS
16:40:19  25  devices in this case.  Court finds that the good faith

16:40:24   1   exception to the exclusionary rule applies to both GPS

16:40:30   2   searches with and without a warrant.  Officers

16:40:35   3   reasonably relied on settled law from a majority of the

16:40:38   4   circuit courts holding warrantless placement of GPS

16:40:43   5   devices lawful, as well as analogous Supreme Court

16:40:52   6   precedent.  Then when Deputy Williams applied for that

16:40:57   7   warrant, he acted reasonably in relying on the issuance

16:41:00   8   of the warrant.  Moreover, upon review of the

16:41:06   9   affidavits, court notes that there was adequate

16:41:08   10  independent justification for the warrant, even absent

16:41:12   11  the information gained by the prior warrantless

16:41:15   12  monitoring.  Based on the court's findings and rulings

16:41:23   13  as set out, the court denies defendant's motion to

16:41:26   14  suppress.  Give me one moment please.  Thank you.  Back

16:43:54   15  on the record.  The court's ruled in regards to the

16:43:57   16  motion to suppress.  It's been denied.  In regards to

16:44:00   17  your case, Mr. Hohn, I'm going to ask the government --

16:44:04   18  this appears to be part of a multi-defendant case, one

16:44:08   19  that I'm not sure entirely, but one that maybe was --

16:44:11   20  was that transferred to our court from a different court

16:44:15   21  or was it initially ours to begin with?

16:44:18   22          MS. MOREHEAD:  It was originally Judge

16:44:20   23  Vratil's and was transferred to you, and I don't

16:44:24   24  remember when that happened, but --

16:44:25   25          THE COURT:  The reason why I ask is, is

| | |
|---|---|
| 16:44:27 | 1 | there all ready a trial setting in this case? |
| 16:44:29 | 2 | MS. MOREHEAD:  There is not, Judge, and if I |
| 16:44:33 | 3 | could bring you at least generally up to speed, there |
| 16:44:38 | 4 | are, as you indicated, a number of co-defendants in this |
| 16:44:41 | 5 | case, and they are all properly joined at this point. |
| 16:44:49 | 6 | There remain outstanding three of the 15 defendants in |
| 16:44:59 | 7 | this case who have not appeared in this court yet, and |
| 16:45:06 | 8 | one of those defendants is Jorge Reynoso.  He's a |
| 16:45:10 | 9 | fugitive.  It's unexpected, you know, who knows if and |
| 16:45:14 | 10 | when we will ever get him in custody, but the other two |
| 16:45:18 | 11 | co-defendants are Michael Redifer and Kerry Randall, and |
| 16:45:23 | 12 | they are both in custody elsewhere.  Just today, they -- |
| 16:45:30 | 13 | Mr. Redifer was in custody in Johnson County and was |
| 16:45:32 | 14 | recently sentenced.  Mr. Randall is currently in |
| 16:45:36 | 15 | Wyandotte County custody and is awaiting sentencing |
| 16:45:40 | 16 | October 17th.  Just today, Mr. Redifer has since been |
| 16:45:48 | 17 | transferred to the Kansas Department of Corrections, and |
| 16:45:50 | 18 | just today, I had a writ issued for him to arrive for |
| 16:45:57 | 19 | his first appearance in this case on November 7th before |
| 16:46:02 | 20 | Judge Waxse.  So, his speedy trial deadline will then -- |
| 16:46:07 | 21 | or his motion hearing deadlines will have to progress. |
| 16:46:12 | 22 | I expect once Mr. Randall is sentenced in a few weeks in |
| 16:46:18 | 23 | Wyandotte, I will go about the same business of getting |
| 16:46:20 | 24 | him brought into federal court.  So, I think the proper |
| 16:46:26 | 25 | thing to do at this point would be to set the case for |

16:46:30  1    trial.  I, though, expect that I will file a motion to

16:46:34  2    continue that.  Under the provisions of the Speedy Trial

16:46:38  3    Act, a reasonable amount of time can be excluded if

16:46:46  4    there are co-defendants whose speedy trial have not ran,

16:46:50  5    and the fact that Mr. Redifer and Mr. Randall are in

16:46:53  6    short course going to be brought before Judge Waxse for

16:46:57  7    their first appearance, we can then proceed forward.

16:47:01  8    But we've kind of been -- Mr. Reynoso was just arrested

16:47:08  9    not that long ago.  I don't know -- I don't know if his

16:47:14  10   deadlines were the same.  Mr. Reynoso just got new

16:47:23  11   counsel appointed -- or not appointed.  Mr. Reynoso just

16:47:28  12   is in the process of retaining new counsel who I think

16:47:32  13   have -- has entered his appearance.  However, he's still

16:47:35  14   getting some fee disclosure information to me before he

16:47:38  15   gets discovery.  So, there's still some outstanding

16:47:41  16   matters on some co-defendants that will extend the

16:47:49  17   speedy trial, but I think we do need to set the speedy

16:47:53  18   trial -- or set a trial date, and then I'll file the

16:47:56  19   appropriate motion probably next week.  So --

16:48:00  20          THE COURT:  This case -- these cases have

16:48:02  21   not been designated as complex cases?

16:48:04  22          MS. MOREHEAD:  I don't think it was.

16:48:07  23          MR. CAMPBELL:  It is not, Your Honor.

16:48:09  24          MS. MOREHEAD:  Yeah, it was not.

16:48:10  25          MR. CAMPBELL:  Additionally, Your Honor, we

16:48:13 1  had originally had motions and trial date set, and when

16:48:15 2  it transferred, other counsel -- we did not, but other

16:48:19 3  counsel had filed to continue the motion and trial

16:48:24 4  dates.  Obviously, this court then granted those

16:48:26 5  motions, although we filed the motion the court just

16:48:29 6  heard prior to the original motion deadline, and did not

16:48:33 7  join in any of those motions for extension, and in fact,

16:48:37 8  oppose those.  We would ask the court to set this matter

16:48:40 9  for speedy trial.  My client has been in custody for a

16:48:43 10 period of time.  Additionally, they filed the original

16:48:47 11 indictment, and then there was a superseding that left

16:48:50 12 my client's charges the same, but added two new

16:48:54 13 defendants, so it reset it that time.  We have been

16:48:57 14 provided all the discovery.  We've been provided access.

16:49:00 15 Government has been great about getting us all of that

16:49:02 16 stuff in a timely fashion, and we would like to have it

16:49:05 17 set.  I understand what counsel has said, but we would

16:49:07 18 like to have it set.

16:49:09 19           THE COURT:  At this time, in light of -- you

16:49:13 20 do have -- Mr. Hohn, you have speedy trial time that's

16:49:16 21 attached to your case, and I'm sure Mr. Campbell's

16:49:19 22 explained to you what that means, and the court's

16:49:21 23 calculations are that your speedy trial time would

16:49:24 24 expire sometime in December.  In light of that, I'm

16:49:27 25 going to go ahead and give you a trial date.  Having

| | |
|---|---|
| 16:49:30 | 1 |
| 16:49:35 | 2 |
| 16:49:39 | 3 |
| 16:49:42 | 4 |
| 16:49:45 | 5 |
| 16:49:49 | 6 |
| 16:49:56 | 7 |
| 16:50:01 | 8 |
| 16:50:05 | 9 |
| 16:50:09 | 10 |

1  said that, you need to talk to your attorney, but you've

2  heard the government say their position is going to be

3  that that trial date that I'm going to give you needs to

4  be continued.  Your case is one of several in this

5  multi-defendant case, and I'm sure Mr. Campbell may have

6  explained to you that the fact that that is your case,

7  then co-defendants' time is sometimes affected by

8  actions taken by other co-defendants.  Notwithstanding

9  that, we have a trial calendar, I believe it's

10 November 5th.  We'll go ahead and set you for trial on

11 November 5th, 2012, be at 1 o'clock in the afternoon.

12 If there's nothing else, this hearing's adjourned.

13 Thank you.

14            MR. CAMPBELL:  1 o'clock?

15            THE COURT:  1 o'clock.

16            MR. CAMPBELL:  Thank you, Your Honor.

17            THE COURT:  If there's nothing else, this

18 hearing's adjourned.  Thank you.

19            (Whereupon, court recessed proceedings.)

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5     I, Nancy Moroney Wiss, a Certified Shorthand Reporter

6  and the regularly appointed, qualified and acting

7  official reporter of the United States District Court

8  for the District of Kansas, do hereby certify that as

9  such official reporter, I was present at and reported in

10  machine shorthand the above and foregoing proceedings.

11     I further certify that the foregoing transcript,

12  consisting of 73 typewritten pages, is a full, true, and

13  correct reproduction of my shorthand notes as reflected

14  by this transcript.

15     SIGNED August 29, 2013.

16

17                    S/_____

18                    Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25